. BUTT *v.* STATE.

Opinion delivered December 17, 1906.

1.  EVIDENCE—STATEMENT IN DEFENDANT'S PRESENCE.—In a prosecution of a senator for bribery, evidence that another senator. in defendant's presence, suggested an organization to control legislation and make money corruptly, to which defendant assented, was competent. (Page 177.)

2. CONSPIRACY—HOW SHOWN.—If the acts of two or more persons were aimed toward the accomplishment of some unlawful object, each doing a part, so that their acts, though apparently independent, were in fact connected, indicating a closeness of personal association and a concurrence of sentiment, a conspiracy may be inferred, though no actual meeting among them to concert means is proved. (Page 179.)

3. TRIAL—ORDER OF PROOF.—It is immaterial whether the evidence showing a conspiracy was introduced before or after the acts of the conspirators were proved, it being sufficient if on the whole case a conspiracy is shown. (Page 180.)

4. EVIDENCE—OTHER CONNECTED CRIMES.—If several crimes are so intermixed or blended with one another or so connected that they form an indivisible criminal transaction, and a complete account of any of them can not be given without proving the other, any or all of them are admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme. (Page 181.)

5. WITNESS—CHARACTER OF ACCUSED.—A reversal will not be allowed because testimony as to appellant's character was not confined to a time anterior to the commencement of the prosecution if the testimony of the witness shows clearly that he referred to a time previous to the prosecution, and no special objection to the testimony on that ground was made. (Page 183.)

6. ACCOMPLICE—HOW TESTIMONY WEIGHED.—In order to determine the truth or falsity of the testimony of an accomplice, it should be weighed by the same rule as the testimony of other witnesses is weighed; that is, by considering their connection with the crime and the defendant, their interest in the case, their appearance on the stand, and the reasonableness of their testimony and its consistency with other facts proved. (Page 184.)

7. CRIMINAL PROCEDURE—BURDEN OF PROOF.—While the guilt of an accused must appear upon the whole case beyond a reasonable doubt, it is not necessary that the different items of evidence which go to establish guilt should be shown beyond a reasonable doubt. (Page 184.)

8. ACCOMPLICE—WHO IS NOT.—Neither silence in the presence of crime, nor failure to inform the officers of the law when one has learned of the commission of a crime, makes one an accomplice. (Page 184.)

9. TRIAL—ARGUMENT OF PROSECUTING ATTORNEY.—A remark of a prosecuting attorney in his closing argument to the jury that in his opinion the State had made the strongest case against appellant that had been made in any of the "boodle" cases, was not prejudicial where the court held the remark improper and instructed the jury to disregard it. (Page 185.)

Appeal from Perry Circuit Court; *Edward W. Winfield,* Judge; affirmed.

*J. V. Walker* and *Sellers & Sellers,* for appellant.

1. The testimony of M. D. L. Cook that he gave money to Covington was incompetent and inadmissible. Before the acts and declarations of a third person may be shown against the party on trial, it must be proved with reasonable certainty that the defendant and the person whose acts, or declarations are offered in evidence have formed a conspiracy to commit the crime for which the defendant is on trial; also that the unlawful conspiracy still exists, and that the acts or conduct of the conspirators offered in proof were in execution of the unlawful purpose. 9 S. W. 50; 57 Pac. 1016; 69 S. W. 153; 65 S. W. 308; 11 Am. St. 581; 40 N. Y. 228.

2. Before Covington's acts could be shown by Cook's testimony, the testimony itself should be sufficient to show *prima facie* that Butt and Covington had formed a conspiracy to bribe. 22 Am. & Eng. Enc. Law (2 Ed.), 1294; 6 Words & Phrases, 5549; Wharton, Crim. Ev. § § 440, 698.

3. The admission of McNemer's testimony as to defendant's reputation in Little Rock was erroneous. At the time of trial, rebutting testimony upon character and reputation, like the testimony in chief, must be confined to a time anterior to the charge under investigation. 12 Cyc. 415; 20 Pac. 396; 38 Pac. 743; Wharton, Crim. Ev. § 63; 20 O. St. 460; 3 Enc. Ev. 27; Winst. (N. C.) 151; Underhill, Crim. Ev. 104; 80 Ky. 480; 46 Ala. 175; 90 Ala. 589; 2 Wig. Ev. 1966; 1 Bishop, Crim. Pros. § 1118.

4. The court erred in its fourth and fifth instructions as to testimony of accomplices. The fourth is argumentative, and the two together tell the jury to convict if there is any testimony, aside from that of the accomplices, tending to connect the defendant with the commission of the crime charged, whether they believe the accomplices or the corroborating witnesses or not. It has always been the rule to instruct the jury that they should view testimony of accomplices with caution. 33 Pac. 98; 12 Cyc. 453; 17 Pac. 519; 11 Enc. Pl. & Pr. 325. To sustain a conviction upon the testimony of an accomplice, he must be corroborated both as to the commission of the crime and the connection of the party charged. 1 Enc. of Ev. 105; 6 S. W. 318.

5. The question of whether witness Hinkle was an accom-

plice or not should have been submitted to the jury. By his own testimony he stood in the attitude of an accomplice, or at least it justified submitting the question to the jury. 26 S W. 830; 48 S. W. 581; 62 S. W. 749; 1 Thompson on Trials, § 1042; 28 Minn. 223; 1 Enc. of Ev. 111; 11 Pac. 797; 42 Pac. 215; 25 S. W. 629; 42 S. W. 301.

6. The testimony corroborative of an accomplice should be of a substantial kind, and the court erred in refusing so to instruct the jury. 75 Ark. 540.

7. The cause should be reversed because of statements of the prosecuting attorney in his closing argument to the effect that he had made the strongest case against the defendant of any of the boodle cases. The prejudicial effect of this statement could not be overcome by a reprimand from the court. 70 Ark. 305.

*R. L. Rogers,* Attorney General, and *Lewis Rhoton,* Prosecuting Attorney, for appellee; *James A. Gray* and *De E. Bradshaw,* of counsel.

1. In proof of a conspiracy great latitude must be allowed. The jury should have before them every fact which will enable them to come to a satisfactory conclusion. 130 Ind. 467; 110 Ia. 81; 137 Pa. St. 255; 107 Fed. 753. Hence the testimony of Cook that he gave money to Covington, and of Hinkle as to the meeting in Covington's room, was competent.

Much discretion is left to the trial court in a case depending on circumstantial evidence, and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact. 55 Conn. 46; 163 Mass. 411; 107 N. C. 822; 159 U. S. 590; 8 Cyc. 678; 77 Ark. 444.

Where the whole evidence shows that a conspiracy actually existed, it will be considered immaterial whether the conspiracy was established before or after the acts and declarations of the members. 122 Ill. 337; 12 Tex. App. 65; 17 Kan. 298; 3 Star Route Trials, 3188; 181 Mo. 173; 99 N. W. 47; 90 Minn. 183; 132 Mich. 537; 4 Am. Crim. Rep. 78; 134 Mich. 537; 157 Ind. 57.

2. Although, in the examination of the witness McNemer as to defendant's reputation, the questions and answers were couched in the present tense, yet it is clear, both from the

direct and cross-examination, that the witness was basing his answers upon information received prior to the commission of the offense for which the defendant was being tried.

3. The court properly charged the jury in its fourth instruction that in weighing the testimony of an accomplice they should determine its truth or falsity by the same rules as they would the testimony of other witnesses. 59 Ark. 422; 98 Cal. 278; 26 Ill. 344; 58 Me. 267; 57 Mich. 505; 39 Miss. 570; 22 Neb. 481; 109 N. Y. 251; 2 Leigh, 769.

There was no error in the fifth instruction given by the court, especially since the court further charged the jury that there could be no conviction upon the testimony of Adams and Cook, unless there was other evidence, independent of theirs, which, of itself, without reference to their testimony, proved, or tended to prove, that the crime charged in the indictment was committed, and that the defendant was a party to its commission.

4. Appellant's objection to the prosecuting attorney's statement in his closing argument is untenable. It was a mere matter of opinion, and so stated at the time. It can not be held to have prejudiced the appellant. 58 Ark. 368; 74 Ark. 256.

5. There was no error in the court's refusal to submit to the jury the question as to whether or not Hinkle was an accomplice, because there is not only no conflict in the testimony, but there is no testimony that could justify a finding that he was an accomplice. 43 Ark. 367; 1 Am. & Eng. Enc. Law, (2 Ed.), 390; 42 Pac. 215; 13 Pac. 896.

RIDDICK, J. This is an appeal from a judgment convicting the defendant of the crime of bribery and sentencing him to pay a fine of two hundred dollars and to be imprisoned in the State penitentiary for the term of two years. The defendant was a member of the State Senate in 1905 when a bill appropriating eight hundred thousand dollars for the completion of the State Capitol was pending before the Senate. The conviction was based on a charge that defendant paid Senator Adams one hundred dollars to induce him to vote for this bill. The evidence, so far as necessary to show the questions of law involved, was as follows:

It was shown by the testimony of witness Hinkle that, soon after the organization of the Senate in 1905, he, with a few

other senators, including defendant, Butt, was present in the room of Senator Covington at the hotel, and that in the course of their conversation Covington said that by standing together they could control legislation, and in substance suggested that they organize and make money by demanding and receiving pay for the passage or defeat of bills. The witness said that he himself did not agree to this suggestion, though he made no response to it, but sat silent for a few minutes while it was discussed by the others, and then left the room and did not return. He further stated that he did not remember what the defendant Butt said in reply to this proposition of Covington, "more than that he seemed to agree," and that Butt thereupon made out a memorandum of the names of those senators that it was believed could be induced to enter the combination.

It was shown by another witness, Cook, that two or three months afterwards, towards the latter part of the session, when bill No. 370, to appropriate eight hundred thousand dollars for the completion of the State Capitol building and for other purposes, had been introduced in the Senate, Caldwell & Drake, a firm of contractors who had a contract for erecting the new Capitol, and who were especially interested in the passage of this bill, paid to witness Cook a large sum of money, over twelve thousand dollars, to be used to influence members of the Legislature. A large part of this, some four or five thousand dollars, was paid by Cook, acting for Caldwell & Drake, to Senator Covington, to be used for that purpose.

It was further shown by the testimony of Senator Adams that the defendant Butt paid him one hundred dollars to vote for the bill, with the promise of four hundred more when the bill became a law. After the Senate adjourned and the grand jury began to investigate these matters, this witness saw the matter in a new light, and says that he returned the money to Butt. Senator Hardy, another witness, testified that while the bill was pending Butt stated to him that there was a rumor that a large amount of money was being used to pass the bill, and that he could get five hundred dollars for voting for the bill. The language of this witness is not quite clear as to whether Butt stated that the wtiness or Butt could get the money. But, let it be taken either way, and it will seen by reference to the testi-

mony of Adams set out in the transcript that Butt approached Hardy in much the same way that he did Adams. Another witness, Hinkle, testified that after the bill was passed it was rumored that money had been used, and that, being informed that Butt had paid Adams one hundred dollars to vote for the bill, he questioned Butt about it; that at first Butt denied it, but finally admitted that he had paid Adams money. Still another senator, Holland, testified that after the Senate had adjourned, and when Covington was being tried, he was told that Adams had returned the money, and he asked Butt about it, and Butt admitted that Adams had returned it, but later made a different statement.

Butt and Covington, who testified for him, both denied about all of this incriminating testimony. This testimony need not be set out here, for the question now is whether the evidence introduced by the State was competent and sufficient to sustain the judgment.

Counsel for appellant contends that there was not sufficient evidence of a conspiracy between Covington and the defendant, Butt, to justify the admission of the declarations and acts of Covington as evidence against the defendant. Before discussing that question, we will say that no declaration by Covington made in the absence of Butt was admitted in evidence. The statement of Covington, made in the presence of Butt, suggesting an organization to control legislation and to make money corruptly, to which Butt assented, is competent, whether there was a conspiracy or not. For that is, in effect, only showing the act of Butt himself. The statement of Covington was admitted as explanatory of this act, and to show to what Butt assented. But, if this evidence be true, it is difficult to believe that no conspiracy existed. When a conspiracy has been shown, then the acts and declarations of one conspirator in furtherance of the common design may be shown as evidence against his associates, and we think the evidence in this case sufficient to show that there was a conspiracy between Covington and Butt and others to pass Bill 370 through the Senate by bribery.

In a recent case decided by this court the following extract from Underhill on Criminal Evidence was quoted with approval: "Direct evidence is not essential to prove the conspiracy. It

need not be shown that the parties actually came together and agreed in express terms to enter in and pursue a common design. The existence of the assent of minds which is involved in a conspiracy may be, and from the secrecy of the crime, usually must be, inferred by the jury from proof of facts and circumstances which, taken together, apparently indicate that they are merely part of some complete whole. If it is proved that two or more persons aimed by their acts toward the accomplishment of the same unlawful object, each doing a part, so that their acts, though apparently independent, were in fact connected and cooperative, indicating a closeness of personal association and a concurrence of sentiment, a conspiracy may be inferred, though no actual meeting among them to concert means is proved." This is a clear and correct statement of the law. Underhill on Criminal Evidence, § 491; *Chapline* v. *State,* 77 Ark. 444.

Nor is it material now whether the evidence showing the conspiracy was introduced before or after the acts of the confederate were received in evidence, it being sufficient if on the whole case a conspiracy is shown. Now, a conspiracy is a combination between two or more persons to do something unlawful or to accomplish something lawful by unlawful means. *Commonwealth* v. *Waterman,* 122 Mass. 57; 6 Am. & Eng. Enc. Law, p. 832.

The evidence tends to show that early in the session at a meeting in his room, Covington made the suggestion to the defendant, Butt, and a few other senators present that they organize for the purpose of controlling legislation and making money out of it. The defendant, Butt, did not dissent from this bold proposition to combine for the purpose of extorting bribes, in other words, to go into it as a regular business, but, on the contrary, if the witness told the truth, he showed a ready response to it, and at once began in a practical way to carry out the suggestion by making a memorandum of the names of those senators who, it was believed, could be induced to join the combination. Later in the session we find these two men doing the very thing that was on that occasion proposed by one of them and assented to by the other. We find that one of them received several thousand dollars which he takes under a promise to use for the passage of this Capitol bill through the Senate, and shortly

after we find the other acting as a distributor of money for the passage of this bill. · Now, it is certain that Butt did not pay out his own money in such liberal sums on this bill. If he paid out money, it was furnished by some one financially interested in the passage of the bill. The evidence shows that there were no others thus interested except the firm of Caldwell & Drake. They did pay out a large sum to bribe senators to vote for this bill. It is therefore morally certain that, if Butt paid out money to bribe Adams on this bill, the money he used came from Caldwell & Drake, either directly or through some agent of theirs. As the evidence shows that this money of Caldwell & Drake was paid to Covington, who was to secure the passage of the bill with the money paid him, it seems probable that Butt was acting under Covington. But, whether that be so or not, they were both engaged in the same undertaking to pass this bill by the corrupt use of money, and were acting for the same principal. Taking the whole evidence together, we think it was amply sufficient to show a conspiracy between them.

But, even if we concede that no conspiracy was shown, a majority of us think that this evidence was competent on another ground. For, while you cannot show separate and isolated crimes or facts having no bearing on the crime under investigation, you can always show all the circumstances connected with the particular crime, even if in doing so you have to bring to light other offenses. You can go back to the time when the intention to commit the crime under investigation was first formed and trace it through all the intervening circumstances to the consummation of the criminal act, and thus lay before the jury the whole transaction. This is necessary in order that they may correctly judge the motives and conduct of the defendant under investigation. "If," says the author of a recent work, "several crimes are so intermixed or blended with one another or connected so that they form an indivisible criminal transaction, and a complete account of any of them can not be given without showing the other, any or all of them are admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme." Underhill, Crim. Ev. § 88.

You might as well expect that one should be able to judge correctly the merits of a play, and of the motives and conduct of

the actors as displayed therein, by witnessing only the last scene of the last act, as to expect, where the crime under investigation is part of a connected scheme, that the jury should be able to determine the motives of the defendant and judge correctly of his guilt or innocence without any knowledge of the origin of the crime or the circumstances and motives that led up to it. The law does not blindfold courts and juries in that way, and it is always competent to show the beginning as well as the end of the criminal transaction.

Now, as before stated, the evidence tends to show that this crime had its beginning early in the legislative session. The rising curtain discloses defendant and certain other senators, guardians of the State, assembled in the room of Covington, President of the Senate, gravely discussing, not the good of the State, but how to take over the business of Cox and Cook, two noted lobbyists, control legislation, and make money out of the passage of bills. This was the beginning. Later, when the bill appropriating eight hundred thousand dollars of the State's money was introduced in the Senate, in which bill Caldwell & Drake, contractors of large means and rather lax ideas about the proper use of money, were greatly interested, an opportunity was presented to put into practice the plan agreed to by Covington and defendant at the beginning of the session.

They did not, however, put Cox and Cook out of business, but acted with them. Cook says that Caldwell put up over twelve thousand dollars to pass this bill. Of this Cook gave Covington $7,000, but $2,500 went for another purpose, leaving about $4,500 to be used in the passage of the bill through the Senate, with the promise of more if it became a law. Cook does not state what he did with the remainder, but he no doubt retained a liberal percentage. Cox appears only in the misty background, but he no doubt got his percentage also. So that the amount paid to Covington probably represents the bulk of that expended on the Legislature. With this sum Covington was to pass the bill through the Senate. The evidence does not directly show to whom Covington distributed this money, or how much of it he retained himself, but it shows that very soon after it was placed in his hands the defendant appeared as the distributor of money to secure the passage of this bill.

As the testimony of Hinkle shows that Covington knew that Butt was ready and willing to engage in a venture of that kind, it, as before stated, seems highly probable that, if Butt paid out any money to secure the passage of this bill, he secured it from Covington. These transactions, from the time the money was paid over by Caldwell to Cook until a portion of it was paid to Adams by the defendant, were all part of the same scheme to pass this bill by buying the votes of senators. The evidence that money was paid by Caldwell to Cook and by Cook to Covington for the passage of this bill is competent because it tends to show where Butt procured the money which he paid to Adams and explains the motives that lay behind this act of Butt. He had no personal interest in the passage of the bill, and there was no reason why he should squander money in that way. If it could not be shown where this money probably came from, the testimony of Adams that Butt paid him money to vote for the bill would seem unreasonable. But the whole thing is cleared when you trace the crime back to its source and view the whole transaction. You then see that Butt was not acting for himself alone, but that behind him was a party interested and willing to pay out large sums of money on this bill. Caldwell did not deal directly with these corrupt legislators, but his desire to make money out of the expenditure for which this bill provided was the moving force that led to this crime, and it was competent to show that he paid money and to trace this money through the different agents into whose hands it came in order to show the whole of the criminal transaction and to explain the motives of the different actors therein. A part of the route that the money took is shown by circumstances only. But, assuming that the witnesses spoke the truth, these circumstances are quite convincing, and to repeat again makes it seem very probable that the money used by Butt came through Covington, and that the whole of this evidence relates to the same criminal scheme. But whether he received it from Covington or not, the evidence tends strongly to show that the act of Butt was only a detail in a larger scheme being carried out by Cox, Cook, Covington and others, and the whole can be shown. We think there can be no doubt of its competency. *Melton* v. *State,* 43 Ark. 368.

The objection to the testimony of McNemer, a witness who

testified for the State in rebuttal as to the character of this defend-
ant, on the ground that it was not confined to a time anterior to the
commencement of the prosecution, is based entirely on the form
of the question propounded to this witness and his answers there-
to. In these the present tense is used, but his testimony shows
clearly that he refers to a time previous to the prosecution.
No special objection was made at the trial to this testimony on
that ground, and the exception must be overruled.

Coming now to the charge of the court, objection is made
to the fourth instruction given for the State on the ground that
"it overrules the statute, and tells the jury that an accomplice
for the purpose of the trial is to be considered the equal of any
other witness." But this is not so. The instruction says that,
in order to determine the truth or falsity of the testimony of an
accomplice, it should be weighed by the same rule as the tes-
timony of other witnesses is weighed. This is correct, for
the testimony of other witnesses is weighed by considering their
connection with the crime and the defendant and their interest in
the case, their appearance on the stand, and the reasonableness or
unreasonableness of their testimony and its consistency with other
facts proved in the case. The testimony of an accomplice should
be weighed in the same way.

Instruction number 8 requested by defendant was clearly
erroneous, for it declared that the jury should not consider
the fact that Cook delivered money to Covington to be used in
the passage of bill No. 370, unless they found "beyond a
reasonable doubt that such money or some part of it was deliv-
ered to defendant for the purpose of use in the passage of the
bill." Leaving out all other objections, this court has several
times held that the different items of evidence that go to estab-
lish guilt do not have to be shown beyond a reasonable doubt.
That doctrine only applies to the guilt or innocence of the defen-
dant on the whole case. As this instruction was properly re-
jected on that ground, we need not notice the other objections
urged to it.

The contention is made that the question of whether or not
the witness Hinkle was an accomplice should have been sub-
mitted to the jury. I felt some doubt myself on this point at
first, but the definition of an accomplice quoted by appellant

from Wharton shows that the evidence in this case falls short of showing that Hinkle was an accomplice. Wharton, Criminal Ev. § 440. Mere silence in the presence of a crime, or the mere failure to inform the officers of the law when one has learned of the commission of a crime, does not make one an accomplice. Hinkle may have been an accomplice, but the evidence in this case does not show it, and the court did not err in refusing to submit the question to the jury. *Melton* v. *State,* 43 Ark. 368; *Carroll* v. *State,* 45 Ark. 539.

We have carefully considered the other objections urged to the rulings of the court in giving and refusing instructions, and in our opinion none of these are tenable.

The prosecuting attorney in his closing argument to the jury said that "in his opinion the State had made the strongest case against Butt that it had made in any of the boodle cases." On objection being made, the court held the remark to be improper, and instructed the jury to disregard it. This ruling of the court was correct, for there was no need to make such a comparison. But, apart from that, the remark was in effect nothing more than the expression of an opinion by the attorney for the State that the case against the defendant was a strong one, and as such we doubt if it could under any circumstances be treated as prejudicial.

This brings us to the question as to whether the evidence was sufficient to sustain the verdict. We have already noticed this evidence, and it need not be repeated here. Whether the witnesses whose testimony implicates defendant and others in this crime spoke the truth was a question for the jury, and not for us. In discussing the case we have assumed that those facts were established which the jury had the right to find from the testimony before them, and the same rule must be applied on this point. Now, one senator testified positively and explicitly that the defendant paid him a bribe of one hundred dollars as alleged in the indictment. Three other senators testified to facts which tended to connect defendant with the crime and to show that he was guilty. Opposed to this testimony of the State is the testimony of the defendant and another senator who was accused of a similar crime, and who the evidence in this case tends to show was implicated in the crime charged against defendant.

It was also shown that defendant had a good character previous to this prosecution. This evidence of his character is probably the most potent evidence in his behalf. In view of the fact that the defendant had previously borne an excellent character, and that it seems unnatural that a man of such character would so soon yield to temptation and be guilty of such a shocking disregard of his duty, there may be those who will disbelieve the evidence against him.

But, although a number of witnesses testified to the good character of the defendant, and only one testified to the contrary, yet the testimony of this witness received some confirmation from the lips of the defendant himself. For defendant, while on the witness stand, after saying that he knew that Tom Cox, whom the evidence tends to implicate in this crime, had the reputation of being a "lobbyist and boodler," admitted that he had written to Cox and solicited his support in defendant's race for the presidency of the Senate, and had visited the home of Cox to see him when he was confined to his room on account of illness. Defendant gave explanations of these acts consistent with honest intentions on his part. But these admissions and the explanations which the production of this letter to Cox forced him to make may have aroused in the minds of the jury some suspicion that his character was not as good as his reputation. But while character and reputation may in doubtful cases be weighed with the other evidence in deciding whether one is guilty or not, it is no excuse or justification for crime. The jury have considered the evidence of defendant's character in connection with the other facts, and have found that he is guilty. After a full consideration of the evidence as found in the transcript, it makes the same impression on us, and we are of the opinion that the verdict was right.

Finding no error, the judgment is affirmed.