PEOPLE *v.* RITHOLZ.

1. BRIBERY—ATTEMPT—CONSTITUTIONAL LAW.

The gist of the offense of attempted bribery of public officers is the attempt to pervert and corrupt the honest judgment of public officers in the discharge of their duties by money or reward, and is not affected by whether the statute or authority under which they purport to function may later be found to be unconstitutional (CL 1948, § 750.117).

2. SEARCHES AND SEIZURES—SEARCH OF PERSON OR PREMISES.

The police have the power and duty to search the person of one lawfully arrested, and also the room or place in which he is arrested, and to which they can get lawful access, for articles that may be used in evidence to prove the charge on which he is arrested.

3. SAME—REASONABLENESS OF SEARCH.

The reasonableness of a search in a case is to be decided on the facts and circumstances of that particular case.

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  8 Am Jur, Bribery § 14.
Criminal offense of bribery as affected by lack of authority of officer.  122 ALR 951.
[2]  47 Am Jur, Searches and Seizures § 19.
Right of search and seizure incident to lawful arrest without a search warrant.  32 ALR 680, 51 ALR 424, 74 ALR 1387, 82 ALR 782.
[3]  47 Am Jur, Searches and Seizures § 52.
[4]  20 Am Jur, Evidence § 401; 47 Am Jur, Searches and Seizures § 52.
[5]  22 Am Jur, Extortion and Blackmail § 2.
[6]  8 Am Jur, Bribery § 2.
[7]  22 Am Jur, Extortion and Blackmail § 4.
[8]  8 Am Jur, Bribery § 33; 22 Am Jur, Extortion and Blackmail § 16.1.
[9]  8 Am Jur, Bribery § 6.
[10, 11, 13, 16]  8 Am Jur, Bribery § 29.
[12]  20 Am Jur, Evidence § 313.
[14]  3 Am Jur, Appeal and Error § 1005.

4. BRIBERY—ATTEMPT—SURRENDERED TAPE RECORDING APPARATUS—
CONSTITUTIONAL LAW.

Neither the receipt of defendant's voluntarily surrendered tape
and tape-recording machine by police officers who arrested de-
fendant on charge of attempted bribery of public officers
nor reference thereto made by the prosecution in cross-examin-
ing defendant *held*, violative of defendant's constitutional
rights (CL 1948, § 750.117).

5. EXTORTION—ELEMENTS.

Extortion is the exaction of money, under color of official rights,
from an unwilling payor (CL 1948, § 750.214).

6. BRIBERY—ELEMENTS.

Bribery of a public official involves the voluntary payment of
money to a public officer with the hope of thereby influencing
his official action (CL 1948, § 750.117).

7. CRIMINAL LAW—EXTORTION—BRIBERY—INTENT.

The same facts may be the basis for the charge of either extor-
tion or bribery, depending upon the intent with which the
money is paid (CL 1948, §§ 750.117, 750.214).

8. SAME—BRIBERY—EXTORTION—PAYMENT—INSTRUCTIONS.

It is for the jury to determine whether or not defendant was
guilty of attempted bribery, as charged, or the claimed victim
of extortion, where the possibly ambiguous fact of payment
of money was admitted and the charge to the jury, taken
as a whole, did not misstate the law and was not unfair to
defendant (CL 1948, §§ 750.117, 750.214).

9. BRIBERY—INTENT.

Corrupt intent is a necessary element in the crime of bribery
(CL 1948, § 750.117).

10. SAME—ATTEMPT—INTENT—EVIDENCE.

The intent to commit an attempted bribery of a public official
is to be gathered from the acts done and circumstances under
which they were done and need not be proved solely by direct
testimony (CL 1948, § 750.117).

11. SAME—ATTEMPT—INTENT—EVIDENCE—INSTRUCTION.

Reluctant admission or exclusion of evidence alleged of past
extortions to which defendant, charged with attempted bribery,
claimed he had been subjected *held*, not to disclose reversible
error at trial of crime alleged to have been committed at a
specified time and place, where testimony as to such time and
place failed to disclose any reference to preceding encounters
and such testimony as was received gave the jury a reason-
ably accurate presentation of the claims of both the State
and the defendant, especially in view of instruction given as
to such matters (CL 1948, §§ 750.117, 768.27).

12. CRIMINAL LAW—INTENT—PROOF OF OTHER OFFENSES—STATUTES.
The purpose of the "intent" statute was to. do away with the rule against proof of other offenses and permit the introduction of such testimony even though it might show the commission of another prior or subsequent offense by defendant (CL 1948, § 768.27).

13. SAME—RELEVANCY OF REMOTE EVENTS—DISCRETION OF COURT.
The relevance of events far removed in time or circumstance from specifically charged attempt at bribery of a public officer is a matter within the discretion of the trial court (CL 1948, § 750.117).

14. SAME—MISCARRIAGE OF JUSTICE.
An error in the trial of a prosecution for crime, in order to be reversible, must have been so gross as to have deprived the defendant of a fair trial and to have resulted in a conviction that was a miscarriage of justice (CL 1948, § 769.26).

15. SAME—REPORT OF CRIME.
A citizen's failure to report crime to the police is not excusable by reason of assumption on his part that his word alone would not be effective.

16. BRIBERY—EVIDENCE.
Evidence presented in prosecution of defendant, partner in an optical company, in prosecution for attempted bribery of members of the board of examiners in optometry, *held,* ample to justify verdict of conviction (CL 1948, § 750.117).

Appeal from Ingham; Hadsell (Philip A.), J., presiding. Submitted October 15, 1959. (Docket No. 79, Calendar No. 47,503.) Decided June 6, 1960. Rehearing denied July 11, 1960. Application for certiorari filed in Supreme Court of the United States October 6, 1960.

Benjamin D. Ritholz was convicted of giving and offering bribe to public officials. Affirmed.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, and *Irving B. Beattie,* Assistant Attorney General, for the people.

*James E. Haggerty, Victor C. Anderson, Harry M. Nayer* and *Stanley E. Beattie,* for defendant.

Smith, J.  This appeal arises from a prosecution for corruptly offering money to influence the action of 3 public officers, members of the board of examiners in optometry.*  It is not denied that money in fact changed hands.  The defendant, however, asserts that the money was not offered with corrupt intent.  He says that he paid it over to terminate a scheme of extortion.  This the jury disbelieved.  He was found guilty, a fine was thereupon imposed, and he was sentenced to imprisonment for a term of years.

The defendant was a partner in King Optical Company.  This company had an office in Lansing adjacent to the office of Dr. E. L. Sanchick.  It was the practice of King Optical Company to refer patients coming to it, in response to its newspaper advertisements, to any doctor in the city, "or to the doctor who leases space next door to us or adjacent to our office."  The Michigan board of examiners in optometry (hereinafter called the board) had brought certain charges against Dr. Sanchick as a result of his relations with King Optical Company,† and it is with respect to defendant's alleged efforts to have the Sanchick case "washed out" by the board that much of the testimony is concerned.

The defendant had first met Dr. Feiler, according to the latter, in Chicago in 1949 or 1950.  Since that time they had intermittent contacts.  In October of 1951 they met in Chicago with respect to a patent matter.  In the following month, November, Dr. Feiler was appointed to the board.  The next meeting between defendant and Dr. Feiler was in 1952 or 1953.  Dr. Feiler's version of this meeting is that it had to do with defendant's difficulties in his contact

---

* CL 1948, § 750.117 (Stat Ann § 28.312).

† In *In re Sanchick*, 347 Mich 620, this Court reversed the order of suspension previously rendered against Dr. Sanchick for alleged unprofessional conduct.

lens laboratory in Chicago, for advices concerning which he, Dr. Feiler, was paid the sum of $350. Defendant's version is that Dr. Feiler came to him, demanded money as the price of peace (with the Michigan board, of which he was now a member), and so received the said sum. Defendant made no report of this to the board, the Illinois police, the Michigan police, or any other law-enforcement agency.

Their next meeting occurred in 1953. Dr. Feiler testified that the meeting related to the sale of some contact lenses belonging to a Dr. Golden, that the sale did not eventuate, and that he was paid his travel expenses by Dr. Golden. Defendant's version was that this, also, was the occasion of further extortion, that Dr. Feiler had said, "You give me $500 or else I'll put you out of business," which sum was thereupon paid over. Again, there was no report by the defendant to the authorities of any jurisdiction of the demands allegedly being made upon him, now, apparently, as a matter of course.

In Chicago, in August or September of 1954, another meeting allegedly occurred. Although Dr. Feiler denies the meeting, defendant asserts that it was the occasion for another demand for money, specifically for $15,000, $5,000 for each of the 3 members of the board. This demand was allegedly overheard by a friend of defendant, Dr. Brill, who testified to that effect. As before, no report of the demand was made to the police.

The Sanchick matter, concerning which the alleged bribe was paid, comes into the record in November of 1954. Dr. Feiler's testimony was that defendant called him, asked him about the Sanchick case and said "he would like to have this washed out." Defendant's version, again, is at variance. It was Dr. Feiler who called him, he says, and again it was a demand for money, this time for $15,000. Defendant

resisted: He replied, he says, that he "wasn't going to be shaken down any more."

In January of 1955, Dr. Feiler testified, defendant again called him regarding the Sanchick case, stating, it was said, that it would be worth $3,000 or $4,000 to have it "washed out." Dr. Feiler testified that he responded that he could do nothing about it but defendant asked that they meet to discuss the matter. Dr. Feiler at this point notified the Federal bureau of investigation of the matter, who, in turn, we gather, notified the State police. When defendant and Dr. Feiler then met, on January 12, 1955, in the Sheraton-Cadillac hotel, the police had installed a microphone, and the conversation was monitored by them. Upon cross-examination the defendant admitted that he had at that time asked Dr. Feiler if he could do anything for Dr. Sanchick. When Dr. Feiler responded, at a later point, "I don't understand just quite what it is you want me to do," the defendant replied, "I want you to do just like anything else. You know what to do. Find a way to wash it out. Instead of the lawyers getting the money I give it to you. It's just as simple as that." The defendant further stated, in the course of their conversation, that if the board was going to push him (defendant) around that he was going to start a little pushing himself, as he had done in Indiana. There, he said, he had "filed a suit in Federal court for a million and a half, suing each member of the board and each member of the association and all of their officers of the association personally, not as an association." He went on, describing his actions, "I wasn't very nice in Indiana. I was a bastard. I had the secretary of the board on the witness stand. I only started with him. I was going to keep him on for 3 weeks, day in and day out." He questioned Dr. Feiler thus: "If I start a number of suits like

I did in Indiana, do they [the board members] scare pretty good?"

The next meeting of the defendant with Dr. Feiler in Detroit was late in March. On the 27th day of this month Dr. Feiler reported to the board members that defendant wished another meeting with him to discuss further the Sanchick case. This meeting was held at the Statler hotel, the respective versions again opposing bribery (Feiler) against extortion (defendant). Although arrangements had been made to meet the next day, at the board meeting the following morning Dr. Feiler was advised by an officer of the State police, and the board, to have no further contact with the defendant. Nevertheless he did meet with defendant at a clothing store in Detroit, at which time and place the defendant put in his pocket an envelope later found to contain the sum of $500. This incident Dr. Feiler did not report to any proper authority until the following September when he turned the money over to the State police and informed an assistant attorney general of the matter. For his derelictions in connection therewith he was later removed from office by the governor.

Various telephone conversations having been had between Dr. Feiler and defendant, and reported by Dr. Feiler to State police officers, he was asked to attend a meeting in Lansing to discuss the matter with an assistant attorney general. Dr. Feiler stated in part that he had been requested by defendant "to get in touch with him" and he was authorized to call defendant in Chicago. This call was monitored by the State police. Dr. Feiler asked if he (defendant) "was going to bring the stuff with him," to which defendant replied, "I'm not paying for anything in advance, not until the goods are delivered." Defendant said he was going to be in Detroit that week end and would contact Dr. Feiler later.

On Sunday, August 7th, defendant prepared to meet with Dr. Feiler in the Statler hotel in Detroit. He had hired Pinkerton detectives and was prepared to record the transaction. Dr. Feiler, however, acting under instructions, did not appear but, rather, telephoned excuses and set up a meeting at the Olds hotel in Lansing for the following night. To Dr. Feiler's inquiry as to whether defendant was prepared "to take care of this thing" the next night, defendant responded that he was not going to Lansing for a joy ride. Defendant thereupon instructed the Pinkerton detectives to meet him the next night at the Olds hotel in Lansing and to use a suite he had reserved.

We now come, at long last, to the happenings at the Olds hotel on the night of August 8th, the date and place of the alleged offense of bribery. Dr. Feiler, the other members of the board, and defendant were in one room. In an adjoining room were the Pinkerton detectives hired by defendant, with their tape recording equipment. In a room nearby were the State police officers. Defendant took charge of the meeting. He said that they were meeting "to see if we can work something out so we will have a little bit of a truce." He made reference to the Sanchick case, and to the antitrust suit he had filed. He spoke of his lawyers in the latter matter and how they were "cleaning up on both of us." We continue with the record. The defendant is testifying on cross-examination:

"*Q.* And did you then say, 'I am going to spend money on lawyers. There is no question about it. I would rather spend it some other way. Do you want me to discuss it with you gentlemen? Or with Julian'?

"*A.* Yes, sir.

"*Q.* And did Dr. Feiler say, 'They are here, and they understand the deal. I want to get out of here. I am not going to stay all night'?

"*A.* Yes, sir.

"*Q.* And did you say, 'All right. We can finish in 5 minutes. I am prepared to pay you $5,000'?

"*A.* Yes, sir.

"*Q.* And did Dr. Grigware say, 'Apiece?'

"*A.* Pardon?

"*Q.* Did Dr. Grigware say, 'Apiece?'

"*A.* Yes, sir.

"*Q.* Asking a question, and did you say, 'No, 5,000 is the money I've got alloted to spend. Rather than spending it on lawyers, I would rather give it to you'?

"*A.* Yes, sir.

"*Q.* And did Dr. Grigware say, 'What do you want in return now?'

"*A.* Yes, sir.

"*Q.* And did you say, 'I don't care who gets it or how it is divided. You know what I mean. In return? I want you to wash out this case. Get this Sanchick case washed out.'

"*A.* Yes, sir.

"*Q.* And did Dr. Howe then say, 'Then what do we get in return?'

"*A.* Yes, sir.

"*Q.* And did you say, 'What?' and did Dr. Howe say, and repeat, 'What might we get in return?'

"*A.* Yes, sir.

"*Q.* And did you say then, 'Well, the Federal case will be washed out too'?

"*A.* Yes, sir."

Additional discussion ensued. Mr. Ritholz said that he would give them "2,000 apiece, make it an even 6," but that he didn't have the entire sum with him. We continue with the testimony of the defendant on cross-examination:

"*Q.* And did Dr. Grigware say, 'No, I should say you don't want to wire it to me' and did you say,

'No, no, to myself. I will have somebody on the plane. I tell you what. One of my cousins, I don't know if you know him, has to go to Windsor anyway, so he can fly up here. We are moving our office to Windsor. So he was going there Wednesday morning. Let him go tomorrow. He will bring the dough. Now, where do you want me to give you the rest of the dough? Here's 300 bucks just to show good faith is all, bind the bargain'?

"*A*. Yes, sir.

"*Q*. And at that point did you hand the money?

"*A*. Yes, sir.

"*Q*. And whom did you hand it to?

"*A*. Dr. Feiler.

"*Q*. And what did Dr. Feiler do with it?

"*A*. He gave $100 each to the other 2 men.

"*Q*. And what did Dr. Howe do with his $100 bill that he had in his hand?

"*A*. I think he put it on the couch.

"*Q*. Back toward you?

"*A*. I don't exactly remember where he put it. You see, I was sitting on a couch, he was sitting on a chair, facing that way (indicating).

"*Q*. Well, what did you do with it?

"*A*. Give it back to him.

"*Q*. And did you say something when you gave it back to him?

"*A*. I don't recall.

"*Q*. Did you say that you wanted him to have it or some words to that effect?

"*A*. Yes, sir. Yes, sir."

At the close of the meeting the board members turned over to the State police the $100 bills they had received. The officers thereupon went to the Ritholz suite, introduced themselves, were admitted, and arrested defendant upon a charge of bribery. Detective Sergeant Chrispell of the State police testified that at this juncture defendant "went to another door in the room and pounded on the door, and

at that time the door opened and there were 3 men standing there."

The defendant was thereupon taken to the State police headquarters and ultimately brought to trial as hereinabove noted.

It is first asserted to us that, "In view of *In re Sanchick,* 347 Mich 620, defendant could not lawfully be adjudged guilty of the criminal offense of bribery defined in section 117 of the penal code." In the case cited the Michigan board of examiners in optometry heard a complaint that Dr. Sanchick had employed King Optical Company as a "capper" or "steerer," in violation of the statute regulating the practice of optometry. The board found that Dr. Sanchick had violated the statute, and suspended his license. On appeal, the circuit court affirmed. Appeal was taken to this Court, appellant urging that there was no evidence to support the finding of the board that he (Dr. Sanchick) employed the King Optical Company as a "capper" or "steerer" as barred by the legislation enacted. Our holding was that the record did not support the allegation made and we reversed the order of suspension.

The above having been our disposition of the *Sanchick Case,* appellant argues to us that defendant could not lawfully be found guilty of paying money to board members "to induce the board to do the very thing which this Court itself enjoined upon them to do," *i.e.,* dismiss such complaint. Related to this issue is that involving the composition of the board. Defendant sought to show that the members of the board were in economic competition with him, had a pecuniary interest in the matter submitted to them, and hence that the act of the legislature creating such board was unconstitutional under the asserted principle of *Milk Marketing Board* v. *Johnson,* 295 Mich 644. From this defendant concludes that "defendant could not as a matter of law

be guilty of bribing a member of such an unconstitutionally created board." To this point defendant cites *State* v. *Butler,* 178 Mo 272 (77 SW 560), a case arising out of the St. Louis municipal scandals around the turn of the century. It was there held that since the ordinance purporting to grant the board of health authority to award a contract for the removal of garbage was illegal and void, money offered a member of the board to influence his judgment in the matter did not constitute a bribe.

The above holding, it is clear, is not the law of this jurisdiction. As we said in *People* v. *McGarry,* 136 Mich 316, 322: "The validity of the act proposed is not the test," nor is the legal sufficiency of the action taken by the board. Here the defendant did insist upon and attempt to obtain the dismissal of the proceedings against Dr. Sanchick, the precise evil attempted to be guarded against in the bribery statutes, namely, the corruption of public officials, the attempt to pervert the exercise of honest judgment in the discharge of their duties. The gist is the attempt to so pervert and corrupt the effort to influence the official judgment by money or reward. It would be a monstrous and shameful doctrine that judgment in the courts or boards of this State might be purchased with insolence and impunity if the law under consideration were later declared unconstitutional, or, indeed, if some flaw were found to exist in the authorization or composition of the court or board before which a matter is heard. *Commonwealth* v. *O'Brien,* 107 Pa Super 569 (164 A 360). We do not, of course, in so holding, imply any illegality in fact in the board's composition, nor do we concede defendant's assertion that our holding in the *Sanchick Case, supra,* meant, as appellant asserts, that "the board had no jurisdiction to entertain" the matter.

It is urged, also, that the police "illegally searched defendant's rooms after his arrest and illegally seized his property consisting of a tape recorder and tape, therefrom." The trial court's denial of defendant's motion to suppress such evidence is alleged to be error. It is argued that the property seized was merely evidentiary material, not an instrumentality of crime or contraband.

It is to be noted that the arrest of defendant Ritholz was made only after the police had received direct evidence from the bribe recipients of the attempt made, and, in fact, were in possession of the three $100 bills paid by defendant. The arrest was thus made pursuant to statute (CL 1948, § 764.15 [Stat Ann 1954 Rev § 28.874]) authorizing an arrest without warrant when a felony has been committed and the officer has reasonable cause to believe that the person arrested has been guilty of the commission thereof.

Such being the case it is clear, as we held in *People* v. *Harris,* 300 Mich 463, 465, quoting *People* v. *Cona,* 180 Mich 641, 652, that:

" 'The police have the power and it is also their duty to search the person of one lawfully arrested, and also the room or place in which he is arrested, and also any other place to which they can get lawful access, for articles that may be used in evidence to prove the charge on which he is arrested.' "

This holding is correctly applied to the circumstances before us. An arrest, in fact, may well be an idle ceremony if the police seizure of evidence of the commission of the crime itself (particularly, as here, an electro-mechanical reproduction thereof) is held to be "unreasonable." The test of reasonableness, as was held in *Harris* v. *United States,* 331 US 145, 150 (67 S Ct 1098, 1101, 91 L ed 1399, 1405) "cannot be stated in rigid and absolute terms. 'Each

case is to be decided on its own facts and circumstances.' " Moreover, we do not overlook the evidence that the tape machine here involved was voluntarily surrendered by the Pinkerton men, and that they made no complaint with respect thereto. *Cf. Holt* v. *United States* (CCA 6), 42 F2d 103. If they are regarded merely as agents of defendant, and their possession his, their voluntary surrender thereof was also his, as well as their surrender of the suite, which had been rented at his order. It is our conclusion that neither the receipt of the tape by the officers, nor the reference thereto made by the prosecution in cross-examining the defendant were violative of his constitutional rights.

Much of the additional error urged upon us involves the assertion that the payment of money to the public officers, above described, was not made with "corrupt intent," but rather with "the innocent purpose of terminating a long series of extortions practiced upon" the defendant. It is asserted, moreover, that "bribery and extortion are mutually exclusive crimes," which the court refused to recognize, thereby committing error not only in the receipt of evidence but in the charge given. We will first examine such alleged errors.

In a case such as we are discussing, the crimes of bribery and extortion are alike in that each involves the payment of money to a public official. There, however, the similarity ends. Extortion is the exaction of money, under color of official rights, from an unwilling payor.* In bribery, on the other hand, the payor voluntarily presses his money upon the public official hoping thereby to influence his official action. Thus, as the Oklahoma criminal court of appeals pointed out in *Finley* v. *State,* 84 Okla Crim 309, 320 (181 P2d 849, 856): "While bribery and

---

* See CL 1948, § 750.214 (Stat Ann § 28.411).

extortion are distinct offenses, the same facts may be the basis for the charge of either extortion or bribery." It depends upon the intent with which the money is paid. In *People* v. *Feld,* 262 App Div 909 (28 NYS2d 796), the appellant was indicted on the charge of extorting money from an employer by threatening to foment a strike among its employees. The defense was that the employer, instead of being a victim of extortion, had bribed the defendant (a representative of the labor union). The court speaks with entire accuracy when it states:

"A question of fact was presented and the appellant was entitled to have the jury instructed that if the employer were guilty of bribery, the appellant could not be guilty of extortion. The 2 crimes are mutually exclusive."

The word to be stressed in the above is the word "guilty." The mere fact of payment alone may be ambiguous, susceptible of interpretation either as bribery or as extortion. It is for the jury to determine which of the offenses, if either, has been committed, of which one there is evidence of "guilt." Only in that sense are the 2 crimes exclusive.

The court below, on the matter of intent, charged in part as follows:

"Now, it is the general claim of the defendant that he did agree to pay $6,000, that is $2,000 each to Drs. Feiler, Howe, and Grigware, on August 8, 1955; that he paid each of these men $100 to apply on that figure; but that his said agreement and the payment on account was made without any corrupt intent to influence the board in the case of Dr. Edwin L. Sanchick, and that the agreement was made by the defendant solely to get the evidence against these public officials for use in exposing them, and that Dr. Feiler had been extorting money from the defendant and that he had led the defendant to be-

lieve that Drs. Howe and Grigware were interested in doing the same."

And, also:

"Whether or not Dr. Feiler had extorted money or was attempting to extort money from the defendant is not the question that you are to decide by your verdict, but you, of course, may use your decision on that question in determining the defendant's intent in the bribery charge."

Although isolated sentences of colloquy or charge may support appellant's allegations of error in this respect, we are not persuaded that the charge as a whole was unfair to defendant or misstated the law. See *People* v. *Coleman,* 350 Mich 268, 282.

Complaint is made, also, relating to the introduction of evidence. It was the claim of the defendant that in paying money to the public officials in the Olds hotel, he did so "for the innocent purpose of ending their continued practice upon him of extortion." He insists that he had no "corrupt" intent and that none was shown. He paid, he says, innocently, to obtain evidence of extortion for submission to the proper authorities in order that he might no longer be made the victim of the defendant's evil machinations. It was a necessary step in his proofs, he asserts, that the series of extortions down through the years be shown, and in this showing he says that he was hampered and restricted by the court's rulings.

Corrupt intent is, of course, a necessary element in the crime of bribery. It is not necessary, however, as we pointed out in *People* v. *Vinokurow,* 322 Mich 26, 30, 31, "that there be direct testimony as to the intent required in the statute. If such were the case it would be almost a rarity when a conviction could be obtained under this kind of a statute." The intent is to be gathered from the acts done and the

circumstances under which they were done. Here
the crime is alleged to have been committed in the
Olds hotel. The testimony of what was said and
done there is utterly barren of any intimation of
previous extortions. The defendant was an ex-
perienced businessman, trained in the law, and well
versed in the uses of the law, as his various anti-
trust suits amply demonstrate. That this man, re-
cording the transaction by his own paid agents,
would have made no reference in his lengthy discus-
sion, with the board members, of the past extortions
of at least one of their number, evidence of which he
claimed to be gathering, is inherently incredible.
That his reluctance to do so stemmed from any moral
or legal scruples over making such criminality a mat-
ter of record is, itself, equally incredible. He was
blunt and to the point respecting his payments. "[In
return for the money] I want you to wash out this
case. Get this Sanchick case washed out." He
would also dismiss the antitrust suit which he had
instituted against the board members and the Michi-
gan Optometric Association.

Upon such record the court might well have held
completely irrelevant to the charge at hand any testi-
mony whatever of past alleged extortions. There
was nothing ambiguous about what was to be done,
or what was sought in return. Nevertheless the
court did permit the introduction of evidence herein-
above set forth, going back to the first meeting
between Dr. Feiler and defendant in 1949 or 1950,
the meeting in October of 1951, the next meeting,
following Dr. Feiler's appointment to the board in
November of 1951, subsequent meetings in 1953, and
a meeting in August or September of 1954 in
Chicago. With respect to these meetings, as we have
seen, 2 different versions were presented to the
jury: that of Dr. Feiler to the effect that they were

of a legitimate business nature, that of the defendant that they were extortionate in character.

We will assume, without conceding, that the Olds hotel incident was sufficiently ambiguous as to require, in fairness to the defendant, the showing of a system of extortionate demands by Dr. Feiler and the board. This may be accomplished through evidence of past acts material to the charge of systematic extortion. The Arkansas supreme court in *Butt* v. *State*, 81 Ark 173, 181, 182 (98 SW 723, 726, 118 Am St Rep 42), in holding that evidence of prior acts of bribery was admissible, stated the applicable principle in these words:

"You might as well expect that one should be able to judge correctly the merits of a play, and of the motives and conduct of the actors as displayed therein, by witnessing only the last scene of the last act, as to expect, where the crime under investigation is part of a connected scheme, that the jury should be able to determine the motives of the defendant and judge correctly of his guilt or innocence without any knowledge of the origin of the crime or the circumstances and motives that led up to it. The law does not blindfold courts and juries in that way, and it is always competent to show the beginning as well as the end of the criminal transaction."

This, it will be noted, does not require the aid of the intent statute,* the purpose of which, as we held in *People* v. *Rose*, 268 Mich 529, 536, "was to do away with the rule as to proof of other offenses

---

* CL 1948, § 768.27 (Stat Ann 1954 Rev § 28.1050), reads:

"In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

and permit the introduction of such testimony even though it might show or tend to show the commission of another prior or subsequent offense by defendant." It is just at this point that defendant makes his thrust at the introduction of evidence relating to the system of extortions. He says it was received with restrictions as to its use, grudgingly, sometimes with disparaging comment as to its materiality, and at times only as bearing upon the credibility of Dr. Feiler. The short answer to all of this is that it was, nevertheless, received, and in such detail that, in our opinion, the jury was given a reasonably accurate presentation of the claims of both the State and the defendant. Even with respect to evidence of system, the relevance of events far removed in time or circumstance must lie within the discretion of the court and we are not persuaded that prejudice arose either from exclusion or reluctant admission. Assuming, as we do, that evidence of a system of extortion was admissible, error would lie in receiving it as bearing solely upon credibility, and not as substantive proof, but we think the court adequately covered the matter in its charge to the jury in which it said:

"Now, it is the general claim of the defendant that he did agree to pay $6,000, that is, $2,000 each to Drs. Feiler, Howe, and Grigware, on August 8, 1955; that he paid each of these men $100 to apply on that figure; but that his said agreement and the payment on account was made without any corrupt intent to influence the board in the case of Dr. Edwin L. Sanchick, and that the agreement was made by the defendant solely to get the evidence against these public officials for use in exposing them, and that Dr. Feiler had been extorting money from the defendant and that he had led the defendant to believe that Drs. Howe and Grigware were interested in doing the same.

"As stated, these general claims as far as the defendant is concerned and the court's statement of them, is not to be taken by the jury to limit the consideration of other claims which have been offered and received in evidence during the trial.

"As I have stated to you before, the gravamen of the offense in this particular case, in view of the admissions of the defendant regarding the agreement and the payment, is the corrupt intent to influence that board in the Dr. Sanchick case, if there was any corrupt intent. You must determine that question to reach your verdict.

"There has been evidence offered and received on the question of whether or not Dr. Feiler was extorting money or trying to extort money from the defendant by threatening his business. This evidence has been admitted for your use in determining the defendant's intent at the time of the agreement and the payment of August 8, 1955. That is the only purpose of such evidence. Whether or not Dr. Feiler had extorted money or was attempting to extort money from the defendant is not the question that you are to decide by your verdict, but you, of course, may use your decision on that question in determining the defendant's intent in the bribery charge.

\* \* \*

"The court also wishes to state that during the course of the trial on at least 1 occasion, and maybe on more, the court ruled that certain testimony regarding the affairs between the defendant and Dr. Feiler was only admissible as bearing upon the credibility of Dr. Feiler, and that I wish to change. That testimony may be also used by you, if you deem it useful, for the purpose of determining the question of extortion in this case."

We have examined the remainder of the alleged errors made, including those relating to evidentiary matters, the charge, and to the prosecutor's cross-examination of the defendant, as well as his final argument, and find they are without merit. Some of

the phraseology of the charge might have been more
artistic, and the prosecutor might at times have been
more gracious, but no trial ever conducted is wholly
without blemish.    Technical error, however, is not
our test.    We must be persuaded that the errors
complained of were so gross as to have deprived de-
fendant of a fair trial, that his conviction was, in
truth, a miscarriage of justice.*    We are far from
so persuaded.    Appellant argues that the evidence
does not sustain the verdict of defendant's guilt
beyond a reasonable doubt.    The evidence thereof,
on the contrary, may be regarded as overwhelming.
Defendant's account of the extortions practiced on
him over a period of years, suffered by him in
silence, verge on the incredible.    He argues that he
did not complain to the police of them because his
word alone would not have been effective.    A citi-
zen's failure to report crime is not excusable by
reason of such assumption on his part.    We note,
also, that at no telephone conversation (between Dr.
Feiler and defendant) monitored by the State police
do we find complaints of past extortions by defend-
ant, though he testifies he made them in abundance
at conversations unheard by others.    Thus the con-
versation held on January 12, 1955, in the Sheraton-
Cadillac hotel in Detroit, heard in its entirety by
the police (and the first monitored conversation) has
a significance beyond that of its actual content.    Up
to this point defendant's versions of the meetings
held with Dr. Feiler have been replete with his (de-
fendant's) protests against the "shakedowns" to
which he was allegedly being subjected.    Yet, al-
though we have examined the police versions of this
conversation with care, the testimony of the officers,
Van Wie, Bogan, and Chrispell, we find it to be ut-
terly barren of reference to past extortions, shake-

---

* See CL 1948, § 769.26 (Stat Ann 1954 Rev § 28.1096).

downs, or other coercion practiced upon defendant by Dr. Feiler. Rather, it is defendant who is aggressively demanding that Dr. Feiler have the Sanchick case "washed out," not only for a money reward, but, if not, under peril of receiving the same kind of legal harassment as defendant had, in his own words, exercised against officials of the State of Indiana. The picture, in short, is not that of a public officer exercising the powers of his office for purposes of intimidation and coercion, but rather that of a citizen demanding that official action cease, both for reward and under threat.

The Olds hotel incident was, as we have noted, likewise barren of such accusations on the part of the defendant, though his bargaining was frank enough to include other considerations, including the dismissal of the Federal case by defendant. Finally, regardless of the merits or demerits of Dr. Feiler, we do not overlook the fact that money was offered to the other members of the board, whose connection with any extortion was far more tenuous than that of Dr. Feiler, if, indeed, it can fairly be said to have existed at all. The case was carefully tried by competent counsel. The evidence adduced against defendant was ample to justify the verdict reached. We find no substantial error in the case and no need to discuss additional claims of error.

Affirmed.

DETHMERS, C. J., and KELLY, BLACK, and EDWARDS, JJ., concurred.

CARR, and KAVANAGH, JJ., did not sit.

SOURIS, J., took no part in the decision of this case.