**August Tom RIZZO, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Ruby NAFIE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

Nos. 16822, 16872.

United States Court of Appeals Eighth Circuit.

June 26, 1962.

Rehearing Denied July 23, 1962.

Charles M. Shaw, Clayton, Mo., for appellant August Tom Rizzo.

Frederick H. Mayer, Asst. U. S. Atty., St. Louis, Mo., D. Jeff Lance, U. S. Atty. and Lee J. Placio, Jr., Asst. U. S. Atty., St. Louis, Mo., on the brief, for appellee.

Murry L. Randall, St. Louis, Mo., Morris A. Shenker, St. Louis, Mo., on the brief, for appellant Ruby Nafie.

Before SANBORN and MATTHES, Circuit Judges, and GRAVEN, Senior District Judge.

GRAVEN, Senior District Judge.

The appellants Ruby Nafie and August Tom Rizzo were found guilty by a jury on a one count indictment. They appeal from the judgments of conviction entered and sentences imposed following the jury verdicts. A five-year prison sentence was imposed on the appellant

Nafie; a four-year prison sentence was imposed on the appellant Rizzo. The latter sentence runs consecutively to an eight-year prison sentence imposed upon Rizzo in the case of Rizzo v. United States (8th Cir. 1961), 295 F.2d 638. The appellants will hereinafter be referred to as the defendants.

The indictment charged the defendants with a violation of the conspiracy statute, Section 371, Title 18, United States Code. In the indictment it was alleged that the defendants conspired to purloin or steal money from the Mercantile Trust Company of St. Louis, Missouri, in violation of Section 2113 (b), Title 18, United States Code. That Section makes it a federal offense for any person to purloin or steal money from a bank whose deposits are insured by the Federal Deposit Insurance Corporation. It is undisputed that the Mercantile Trust Company was a bank whose deposits were insured by the Federal Deposit Insurance Corporation.

On December 2, 1960, the defendant Nafie was a teller in the Mercantile Trust Company of St. Louis, Missouri. Shortly after 11:30 o'clock A.M. on that day she reported that because of threats to her life she had delivered over to a colored man through her teller's window a large amount of currency. The Government's case against her and her codefendant Rizzo is based upon the theory that the alleged holdup was a simulated holdup and that it was the product of a conspiracy between the two.

Each of the defendants makes numerous assignments of error. The indictment was returned on January 25, 1961. Shortly thereafter each of the defendants made several pretrial motions. On February 20, 1961, the trial court heard the motions then pending. Among those motions were motions of the defendants for separate trials. Those motions were denied. The case was set for trial on March 27, 1961, at St. Louis, Missouri. On March 14, 1961, the de-

fendant Rizzo filed a motion for a continuance of the trial. In his motion he alleged that he had recently been on trial in St. Louis on another criminal charge and that there had been extensive newspaper, television and radio publicity in connection with that trial.[1] He asked that the trial be continued until later in the year. The defendant Nafie did not make a motion for a continuance. However, she filed a statement in which she stated that she had no objection to the continuance being granted. On March 17, 1961, the trial court entered an order granting the motion. The trial of the case was then set for June 5, 1961.

On June 6, 1961, the case came on for trial. Just prior to the impanelling of the jury the defendants orally moved for separate trials. The defendant Nafie then also orally moved for a continuance and transfer of the case because of recent publicity as to the defendant Rizzo. The attorney for the defendant Rizzo stated that the latter did not join in that motion. The trial court overruled the motions for separate trials. The trial court stated that while for the present it would overrule the motion of the defendant Nafie for a continuance it would determine as the trial progressed whether cause for a continuance appeared. Twenty-eight prospective jurors were then called and sworn. The trial judge first addressed a number of questions to the members of the panel collectively. One of the questions so put was whether any of the panel recalled having read or heard anything about the case either from newspapers or over radio or television. Those who had were asked to raise their hands. Eighteen jurors held up their hands. Following this the record shows the following:

"THE COURT: Is there any member of this panel who held up their hands a moment ago that they have read or heard some news accounts of the matter on trial here? Is there any member of this jury

1. Presumably on the charge involved in the case of Rizzo v. United States (8th Cir.1961), 295 F.2d 638.

panel who has formed an opinion from what they have read or what they have heard as to either the guilt or innocence of these defendants? If there is, would you indicate by holding up your hand, and only you would know the answer to that question.

"Let the record show no juror has indicated.

"Is there any member of this jury panel, those of you who have been sworn, to whom these questions are directed—Is there any member of this jury panel who would require, if you are selected as one of the jury, evidence to remove from your mind any thought or recollection that you may have read or heard from any newspaper or other news account of this matter? In other words, is there any member of this panel that would carry into the jury box with them any recollection which in your own mind would require you to have evidence before you would remove that recollection of evidence or that recollection of any account which you may have read or heard?

"Is there any member of this panel that feels they can not go into the jury box with an open mind, receptive mind, ready to listen and be guided only and solely by the evidence you hear and the instructions of the court? Is there any member of this panel who feels they can not do it in the trial of this lawsuit because of anything they may have read or heard concerning this case?

"The record may show no juror has indicated they can not so do."

Following the questions put to the members of the panel collectively, the trial judge examined a number of jurors individually. Following that the attorneys were given leave to conduct voir dire examination. The members of the panel were first examined individually by the attorney for the Government. They were then examined individually and at considerable length by the attorneys for the defendants. That examination included the matter of what they may have heard about the case. In the examinations the members of the panel repeatedly assured the Court and the attorneys that they had formed no opinion about the case from what they had heard and that if chosen as jurors they would decide the case solely upon the evidence presented at the trial and they would fairly and impartially decide the issues in the case.

After having examined the members of the panel on voir dire individually and at length, the attorneys for the defendants requested that they be given leave to further examine each member of the panel who had read something about the case in the newspapers individually and apart from the other members of the panel. The attorneys for the defendants were then asked by the trial judge if they wished to make any direct challenges to any of the members of the panel. The attorney for the defendant Nafie answered that he had none unless his request for further examination was denied in which event the defendant Nafie would " * * * challenge all of those who had read newspaper articles concerning the case * * *." The defendant Rizzo apparently concurred in that action of the defendant Nafie. The trial court then denied the requests for further examination under the conditions proposed. Thereafter and before the jury was sworn to try the case the defendants moved for a transfer or in the alternative for a mistrial " * * * in view of the fact that members of the panel have read newspaper accounts concerning this case * * *." Those motions were denied. The trial judge then admonished the jury that they were not to read newspaper accounts of the case or listen to any radio and television accounts of the case and that they were not to allow their wives or husbands to tell them what was contained in such accounts. Thereafter at each recess during the trial and at the end of each day's session the trial judge admonished the

members of the jury not to read any newspaper accounts of the trial and not to listen to any radio or television accounts of the trial and not to discuss the case with anyone.

During the trial the defendants prior to the commencement of each day's session, in the absence of the jury, presented to the trial judge newspapers containing accounts of the trial and asked for a mistrial. On each occasion the trial judge would make inquiry of the members of the jury as to whether they had read any newspaper accounts of the trial or heard any radio or television accounts of the trial. On each occasion it was the response of the members of the jury that they had not. The defendant Rizzo assigns error on the part of the trial court in overruling his motions for mistrial made based on newspaper articles appearing during the trial. The defendant Nafie does not make that assignment of error. The defendant Rizzo did not at the trial or since make any showing or offer to make any showing that any of the members of the jury had read any of the newspaper accounts as to the case during the trial. His assignment of error is based upon the assumption that the members of the jury disregarded the repeated admonitions of the trial judge against the reading of newspaper accounts of the trial.

■ In the case of Fairmount Glass Works v. Cub Fork Coal Co. (1933), 287 U.S. 474, p. 485, 53 S.Ct. 252, p. 255, 77 L.Ed. 439, the Court stated:

"Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct."

Our jury system is based upon assumption that juries will endeavor to follow the Court's instructions. Delli Paoli v. United States (1957), 352 U.S. 232, 242, 77 S.Ct. 294, 1 L.Ed.2d 278. Where a jury has been clearly admonished not to read newspaper accounts of the trial in which they are serving as jurors, it is not to be presumed that they violated

that admonition. State v. De Zeler (1950), 230 Minn. 39, 41 N.W.2d 313, 320, 15 A.L.R.2d 1137. Where there is no showing that any of the jurors violated the admonition of the Court not to read newspaper accounts of the trial, it is not to be assumed that as a matter of human nature they did violate the admonition. State v. Sawyer (1954), 266 Wis. 494, 63 N.W.2d 749, 756. In the case of United States v. Sorcey (7th Cir. 1945), 151 F.2d 899, p. 903, certiorari denied (1946), 327 U.S. 794, 66 S. Ct. 821, 90 L.Ed. 1021, the Court stated: " * * * we must not permit the integrity of the jury to be assailed by mere suspicion and surmise; it is presumed that the jury will be true to their oath and conscientiously observe the instructions of the court * * *." In the present case there is not one shred of evidence that any of the members of the jury panel did, during the trial, read any newspaper accounts of the trial. The assignment of error of the defendant Rizzo in this connection has to be based upon the theory that misconduct on the part of the members of the jury was and is to be presumed. Such is not the law. The assignment of error in question is lacking in merit.

Both of the defendants assign error on the part of the trial court because it refused to allow them to continue the voir dire of the members of the jury panel individually and alone of those who had read something about the case prior to being summoned on the panel. As heretofore noted, the defendants were given the opportunity to examine the members of the jury panel individually and at length. In those examinations the matter of their having read something about the trial was fully gone into. The defendants did not indicate what further light on that subject might have been developed by further examination.

■ Where during a trial it appears that members of a jury have violated the instructions of the Court in the matter of reading newspaper accounts of the trial, it is the proper practice, if not required practice, for the

examination of individual jurors as to that matter to be conducted in the absence of the other jurors. An examination of jurors as to alleged misconduct because of their having, during the trial, read newspaper accounts of it in violation of their instructions presents a very delicate and troublesome situation. There is then present the possibility of punishment for misconduct. The trial then being under way, the situation is fraught with grave possibilities in the matter of mistrial. In the examination of members of a jury panel in advance of their being selected as jurors in a trial about to start the situation is different. Members of the panel who may have read newspaper accounts as to the case prior to being summoned would not be chargeable with misconduct for having done so. In the examination of the members of a jury panel, all that is involved is their qualification to serve as jurors. If on that examination it is indicated that any of the members may have heard something about the case which might prevent them from deciding the case fairly and impartially based on the evidence in the case, such members of the panel could be directly challenged for cause and removed from the jury panel.

■ In few federal court criminal cases are the defendants afforded such an opportunity to examine the members of the jury panel on voir dire as was afforded to the defendants in this case. The attorneys for the defendants were allowed to conduct their own voir dire examinations and to examine the members of the panel individually and at length. The impanelling of the jury took up one entire day of the trial. The transcript of the voir dire examinations is in excess of one hundred pages in length. The matter of the members of the panel having read something about the case before being summoned was fully and extensively explored. As heretofore noted, the defendants did not make any direct challenge for cause as to any individual member of the panel. The matter of permitting the defend-

ants to continue their voir dire examination of prospective jurors in accord with their requests was within the discretion of the trial judge. No abuse of discretion is shown.

Both defendants assign error on the part of the trial court because of its refusal to sustain their blanket challenge for cause to all of the members of the panel who had read something about the case prior to being summoned. Those assignments of error are predicated upon the theory that any member of a jury panel who may have read something about a case before being so summoned is disqualified from serving on the jury in such case.

In the recent case of Irvin v. Dowd (1961), 366 U.S. 717, pp. 722, 723, 81 S.Ct. 1639, p. 1642, 6 L.Ed.2d 751, the United States Supreme Court stated:

"It is not required * * * that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

In the recent case of Blumenfield v. United States (8th Cir. 1960), 284 F.2d 46, 51, this Court stated (p. 51):

"It is clear that the mere presence of adverse publicity does not per se establish proof of prejudice, or necessarily establish that a de-

fendant will be unable to obtain a fair trial within the district. 'The mere fact that a juror has read newspaper accounts relative to a criminal charge is not in itself sufficient grounds for excusing a juror.' Finnegan v. United States, 8 Cir., 204 F.2d 105, 110, certiorari denied 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347. The ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the *voir dire* examination. * * * "

The blanket challenge of the defendants to the jury panel was properly overruled.

Closely connected with the assignments of error just referred to are the assignments of error that the defendants make in regard to their motions for transfer or continuance. It was heretofore noted that the trial judge did grant the motion for continuance made by the defendant Rizzo early in the proceedings. It was also heretofore noted that in connection with the overruling of the motion for continuance made just prior to the impanelling of the jury the trial judge stated that he would determine the need for a continuance as the trial progressed. It is well known that the voir dire examination of a jury panel is very enlightening and informative as to the need of continuing the trial of a case or transferring it. The trial judge thereafter, during the course of the trial, overruled further motions of the defendants for continuance or transfer. It is clear that the trial judge was of the view that nothing was shown in the voir dire examinations or in the course of the trial which indicated the need of continuing the case or transferring in order to afford the defendants a fair and impartial trial. The matter of continuing the trial of a case or transferring a case is one within the discretion of the trial judge. Connelly v. United States (1957), 249 F.2d 576, 584, 585, certiorari denied (1958), 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed. 716. See also Beck v. United States (9th Cir. 1962), 298 F.2d 622, 628, 629, certiorari denied (June 11, 1962), 370 U.S. 919, 82 S.Ct. 1558, 8 L.Ed.2d 499. The defendants have not shown any abuse of discretion on the part of the trial judge in denying their motions for continuance or transfer.

Both of the defendants assign error on the part of the trial judge in denying their motions for separate trials. The defendants were charged with conspiracy. Many conspiracy trials involve many defendants. Many conspiracy trials involve numerous events, transactions or occurrences. In the present case there are only two defendants—the very minimum for a conspiracy charge. The conspiracy charged related to only one matter, which was the purloining of money from the Mercantile Trust Company by means of a simulated robbery. The case was free from the feature of multitude defendants and was factually uncomplicated. The defendants in their motions for severance set forth several reasons why they should have separate trials. The motion of the defendant Nafie for a separate trial set forth the following five grounds:

"(1) Evidence may be introduced by the Government which may be admissible against her co-defendant but which may be inadmissible against this defendant, all to her prejudice.

"(2) Evidence may be introduced by her co-defendant which would be inadmissible against this defendant in a separate trial to the prejudice of this defendant.

"(3) This defendant may desire to call her co-defendant as a witness in her behalf but will be precluded from doing so at a joint trial.

"(4) This defendant as well as her co-defendant will obtain a fairer and more impartial trial if she is tried alone.

"(5) The jury will have insurmountable difficulty in distinguish-

ing the alleged acts of this defendant from the alleged acts of her co-defendant."

The motion of the defendant Rizzo set forth similar grounds. Just prior to the impanelling of the jury the defendant Nafie orally renewed her motion for a separate trial and added the additional ground that the defendant Rizzo had been the subject of undesirable publicity. The trial judge overruled the motions.

■ The feature of certain evidence being evidence against one defendant but not against another defendant is usually present in every joint trial. It is well settled that the fact that in a joint trial there will be evidence against one defendant which is not evidence against another defendant does not require separate trials. Costello v. United States (8th Cir. 1958), 255 F.2d 389, 395, certiorari denied (1958), 358 U.S. 830, 79 S.Ct. 51, 3 L.Ed.2d 69.

In her motion the defendant Nafie alleged that she would be prejudiced by a joint trial because of the undesirable newspaper publicity as to the defendant Rizzo. The matter of newspaper publicity was heretofore considered.

The contention of the defendants that they should have separate trials because each might desire to call the other as a witness and would be unable to do so in a joint trial subsequently became moot as each of them testified in the joint trial.

■ The surrounding circumstances in the present case and the evidentiary situation in the present case were not such as to make it an unusual type of conspiracy trial. The matter of granting a motion for a separate trial is a matter of discretion on the part of the trial judge. McDonald v. United States (8th Cir. 1937), 89 F.2d 128, 136, certiorari denied (1937), 301 U.S. 697, 57 S.Ct. 925, 81 L.Ed. 1352. There is nothing in the record in the present case that lends support to the claims of the defendants that the trial court abused his discretion in denying their motions for separate trials.

The defendants make numerous other assignments of error which will be considered following a consideration of the evidence.

The defendant Rizzo is a resident of St. Louis. During some of the years prior to 1959 he had been engaged in or connected with the operation of an automobile sales agency. He had also been engaged in a freezer food plan business. In the latter part of 1959 he became connected with the operation of a bar tavern known as the Fire Place located at 3427 South Kingshighway. The defendant Nafie lived in an apartment house at 4939 Potomac, which was about a block away from the Fire Place. She was employed as a teller by the Mercantile Trust Company and had been so employed since 1953. She was a divorced woman. Michael Carnaghi was a member of the St. Louis Police Department. He had been acquainted with the defendant Rizzo for several years prior to 1959. After the defendant Rizzo commenced the operation of the Fire Place Carnaghi helped tend bar at that place and also did some maintenance work at that place. Carnaghi was separated from his wife. He resided about two blocks from the defendant Nafie. Starting in 1959 he started going steady with her. Through him she became acquainted with the defendant Rizzo. Just prior to the opening of the Fire Place, the defendant Nafie made the defendant Rizzo a loan of $2,000. That loan was made upon the suggestion and recommendation of Carnaghi. That loan was subsequently repaid.

Charles A. Betsher was one of the witnesses for the Government. He was a law school graduate but for some years had been engaged in the insurance business. From 1957 until 1960 he was a general agent for the Franklin Life Insurance Company at St. Louis. At the time of the trial he was no longer with that company. On March 6, 1961, in the Eastern District of Missouri, he entered a plea of guilty to an indictment in which he and the defendant Rizzo were charged with devising and executing a

scheme to defraud the Franklin Life Insurance Company. The scheme involved the obtaining of policy loan checks from that insurance company and cashing them by means of forged instruments. At the time of the trial Betsher had not been sentenced. Rizzo entered a plea of not guilty. Upon trial he was convicted of the charge and his conviction was affirmed. Rizzo v. United States (8th Cir. Nov. 6, 1961), 295 F.2d 638. At the trial in the present case it was brought out during the examination of Betsher that he had been convicted of fraud by wire and fraud by mail and that the defrauded party was the Franklin Life Insurance Company. The details of the offense were not gone into. The matter of the conviction of the defendant Rizzo on that charge was not brought out or gone into. His appeal from that conviction was pending at the time of the trial in the present case. Betsher testified he had been acquainted with the defendant Rizzo since 1958 and had frequent contacts with him thereafter. He testified that in August, 1960, he met him in a bar tavern known as the Flaming Pit and Puppet Pub and had a conversation with him. His testimony as to that conversation is hereafter set forth with the objections and the matters relating to the objections omitted. In response to questions by the attorney for the Government, he testified, in part, as follows:

"Q. Can you tell me what that conversation was about?

"A. Well, we had on occasion discussed many legitimate business deals and he had indicated he was in dire need of money and frankly, I was also in dire need of money, and he had suggested previously to this on numerous occasions, the possibility of obtaining money through a bank or what I would consider a phony bank holdup.

"Q. Did he go into details concerning this bank holdup or phony holdup, as you have stated?

"A. Yes. * * *

*     *     *     *     *     *

"Q. * * * All right, you may answer.

"A. He stated that he knew a female teller at a downtown bank who would, shall we say, be in on an arrangement, whereby it would be, in his words, as simple as making a withdrawal. You walk in, you walk out with the money. One hundred fifty thousand dollars. There would be a note placed at her cage to give her adequate protection in reporting it as a holdup attempt and the—after the holdup or attempted holdup or whatever you call it was made, she would hesitate and could hesitate for any number of minutes, even an hour, to where the party involved could be back to wherever they wanted to go and have plenty of, shall we say, alibi witnesses and so on because the time of the robbery being quite important. He also indicated that the note would be either typewritten or words from newspapers or magazines clippings and the bag would merely be placed there like, you know, a normal withdrawal would be made by a depositor; that the person would just walk out with the money; that it was all pre-arranged.

"Q. Now, had he described this girl or told you about the girl there that day?

"A. Well, yes, because I asked him naturally how in the world anybody could arrange such a thing; and he said first of all, she is going with a policeman, she is very familiar with police work. She is well thought of in the bank, she had been there a long time. There would be no questions asked as far as she is concerned. It would be completely legitimate from beginning to end as far as the police investigation would be concerned * * *.

*     *     *     *     *     *

"Q. * * * Did he make any approach to you as to what your participation would be?

"A. He indicated to me that if I would merely drive the car around the block. In other words, let him out, drive the car around the block, I would receive at least 10 per cent of the proceeds for merely being there.

"Q. Now, other than that the teller had gone with a cop or a policeman, whatever he said, was there any other description * * * ?

*    *    *    *    *    *

"Q. * * * All right, what was said by Mr. Rizzo?

"A. I asked him, is it anyone that I know, and he said, it is the party that has cashed checks for us.

*    *    *    *    *    *

"Q. * * * Was there any other identification or statement of Mr. Rizzo as to who that person was?

"A. Yes, sir. He said, I had seen her in his company at the Lamp Light or Lamp Lighter. It is an establishment just off of South Kingshighway.

"Q. Now, do you ever recall being in the Lamp Light or Lighter Tavern?

"A. Yes, in June and July and the early part of August. I had been in there, I would say, three times at the most and on this one specific occasion to which he referred, I was in there with a Brad Sallus and another gentleman and Gus [Rizzo] came over and said hello; and the table from which he came was where this party was seated along with other people, of course.

"Q. Now, do you see that person in the courtroom today who was seated there?

"A. Yes.

"Q. Can you point her out, please?

"A. It is the woman seated next to the gentleman in the blue suit.

"THE COURT: The record may show he has indicated the defendant Nafie."

Charles Moore, a witness for the Government, had previously been associated with the defendant Rizzo and a brother of the latter in the freezer food plan business. After the defendant Rizzo commenced the operation of the Fire Place, Moore helped out there for a while. He testified that in May, 1960, he attended a barbeque at the defendant Nafie's apartment which was also attended by the defendant Rizzo. He further testified that a short time after the barbeque the defendant Nafie came into the Fire Place for dinner. He then testified as follows:

"Q. Was she by herself?

"A. She was.

"Q. When she came in, can you tell me just what happened and where she went.

"A. She came in for dinner and she sat down at a table.

"Q. Was she sitting alone?

"A. She was.

"Q. Did anyone join her?

"A. Gus [Rizzo] went and sat down with her at the table and * * * it was kind of slow and I sat down with her for just a few minutes.

"Q. Did you hear a conversation or recall what was said at that time?

"A. Well, just general conversation and then Mr. Rizzo asked her if she would cash another one of those Franklin checks.

*    *    *    *    *    *

"Q. What did Miss Nafie say to that?

"A. She said no, she was—she didn't want to cash any more of those checks.

"Q. What else did she say?

"A. She said it would be easier to rob the bank."

Donald Ray McGill testified as a witness for the Government. He testified that in 1952, at the age of eighteen, he had been convicted of bank robbery in Illinois and that he had been paroled from the sentence imposed for that crime in 1957. He testified that in the summer of 1960 he was employed by a company engaged in the retail automobile business whose place of business was near the Fire Place and that he used to frequent that place. He testified that on one occasion he discussed his conviction of bank robbery with Rizzo. About three weeks later in October or November, 1960, at the request of Rizzo, he rode with him to the Mercantile Trust Company. Rizzo suggested that he participate in a fake holdup of the bank. He then testified, in part, as follows:

"A. He [Rizzo] said he had this teller in the bank and that she would go along with everything on a fake holdup. Word for word, he didn't say too much more about it except that there was no chance of getting caught or nothing like that. When we got to the bank * * *. He parked right in front of the bank, then we went inside the bank and just as we went inside he looked at his watch. Then we walked all the way around the bank to the far side of it and as we went by this teller's window, he indicated that was the teller.

"Q. All right. At that point did you look at that window, the teller's position that he indicated?

"A. Yes, sir.

"Q. And the person that was in that teller's window, did you recognize her?

"A. Yes, I do.

"Q. Where did you recognize her from?

"A. I had seen her several times getting off the bus in front of Beyers Motors and walking up Potomac and I had seen her several times in the Fire Place.

"Q. When she was at the Fire Place, did you ever see her in the company of anyone or with anyone at that time?

"A. I had seen her with this policeman, Mike.

"Q. Mike? Do you know his last name?

"A. Carnaghi, I believe.

"Q. The person who was behind that window, the person you state you had seen on previous occasions do you see her in the courtroom today?

"A. Yes, I do.

"Q. Will you point her out, please?

"A. Right over there.

"Q. All right. When you looked at this teller's cage, did you say anything to Rizzo?

"A. Yes. I told him that girl goes with a policeman. I indicated to him that would be a very bad thing to get involved with someone who was going with a policeman.

"Q. A little louder, please.

"A. He said that the policeman didn't know anything about it and that if he found out later for enough money he would keep quiet.

"Q. All right. Now from that teller's cage, what happened and what did you do?

"A. We continued walking. We never did stop walking actually. We walked right out the Locust Street door, walked up the street about a block. He timed it and said it would take about three minutes to make the trip at the most. He said after we got in the car and was going back, he said it would take the police approximately seven minutes to put up a block around town and as this girl would give a phony description about colored people robbing the bank because there was work being done there.

"Q. There was work being done?

"A. Yes.

"Q. All right.

"A. He said they would look in the other end of town more than in our end of town. He also said she would scream and faint which would allow approximately five minutes."

McGill further testified that Rizzo talked to him later and suggested he make up a note to take in a bag to the Mercantile Trust Company. He then further testified as follows:

"Q. Was anything further said about this note, how the note would be given?

"A. He told me that the girl would indicate to take the money out of both drawers so she would be covered if anything happened.

"Q. Was there anything stated as to how this note was to be made?

"A. I was to cut it out of a newspaper or magazine and paste it on paper."

McGill withdrew from the proposed scheme. It is indicated that when on December 2d, 1960, he heard about the claimed holdup of the Bank he called up the Federal Bureau of Investigation.

The Bank has numerous tellers' cages. The defendant Nafie worked at teller window No. 62. She was a paying and receiving teller. The tellers are allowed forty-five minutes for lunch. The lunch periods are alternated. One group goes to lunch at 10:15 o'clock A.M. and another group goes to lunch at 11:00 o'clock A.M. On December 2, 1960, the defendant Nafie reported for work at 9:00 o'clock A.M. Just before starting work in her teller's cage she received from and receipted to the currency teller currency in the amount of $24,215.08. During the forenoon prior to her lunch hour she received from and receipted to the currency teller for $8,000 additional currency. Included in this latter currency was $1,000 in new fifty-dollar bills and $2,000 in new twenty-dollar bills.

The defendant Nafie was among those assigned for the earlier lunch period.

At that time the teller's cage on one side of her was not in use. The teller's cage on the other side of her was in charge of Maureen Hensgen who was assigned to the latter lunch period. On the day in question the defendant Nafie had with her a fairly good-sized handbag. At around 10:15 to 10:20 o'clock A.M. the defendant Nafie locked up her teller's cage and went out for lunch. She returned at around 11:10 to 11:15 o'clock A.M. Maureen Hensgen, the adjoining teller, then left for her lunch. Harriet Conyers, another teller, worked in teller cage No. 64. She returned from lunch on that day around 11:00 o'clock A.M. Shortly after 11:30 o'clock A.M. the defendant Nafie called to Harriet Conyers to come quickly. Harriet Conyers went to the defendant Nafie's cage and was informed by the latter that she had been held up. Harriet Conyers ran and told Herman Orlick, the Assistant Vice President of the Bank in charge of teller operations, of the occurrence and he came to the scene of it. Since the defendant Nafie appeared to be distraught, he called for the Bank's nurse and she was shortly taken to the nurse's quarters. Subsequently the defendant Nafie gave her version as to what had occurred. At the trial she testified that between 11:30 and 11:35 o'clock A.M. two colored men approached her teller's window. One of them put a brown paper bag in the opening in the grating. She also testified as follows in regard to the occurrence:

"Q. Then tell me what happened.

"A. I poured the silver out on the counter and started to count it. I think it was mostly quarters, I am not sure, and there was a piece of paper wadded up in it and I picked up the piece of paper and I started to hand it to him and I read it. I had it open enough to read it.

"Q. All right. What did it say?

"A. I believe it said give me everything in the right drawer, of the righthand drawer.

\*    \*    \*    \*    \*    \*

"Q. You say you read the note; then what happened ma'am?

"A. Well, I started putting the money in the bag.

\* \* \* \* \* \*

"Q. Would you tell me, would you describe as best you can recall putting the money in the bag.

"A. I opened the righthand drawer and I put two or three handfuls of money in the bag. I dropped one in the drawer and picked it up and put it in again; and about that time is when he said, 'That is enough.' I took the bag and put it to the window and he jerked it through. He got his hand underneath the opening and he jerked the bag through the window.

\* \* \* \* \* \*

"Q. While you were putting the money in, did he say anything?

"A. Well, that is just when he said give me everything and don't make a sound or I will kill you, and I thought he said something about an alarm but I didn't hear exactly what he said."

She testified that the men then left and she called to Harriet Conyers.

A check of the currency after the claimed robbery showed that $15,226 in currency was missing. The note allegedly given her in connection with the alleged robbery was made up of words cut out of magazines or newspapers.

Some construction work was going on on one of the upper floors of the Bank. Some negroes were in the employ of the contractor doing that work. It was apparently the theory of the defendants that negroes connected with the construction work staged the claimed robbery. That matter was gone into at length by the defendants in cross examination.

The Bank building was bounded on the south by Locust Street, on the north by St. Charles Street, on the west by Eighth Street, and on the east by an alley. There were entrances into the Bank lobby from Locust Street, St. Charles Street and Eighth Street. In the east lobby there was a row of tellers' cages numbered 56 through 66. They extended north and south. Teller cage No. 66 was at the north end of that row of tellers' cages. There were numerous guards on duty during banking hours. One of those guards was Albert Ennis. He was a former member of the St. Louis Police Department. On December 2, 1960, at around 11:15 o'clock A.M., he returned from lunch. He then took up a position to the north of teller cage No. 66. He faced south so that he had under his observation the area in front of tellers' cages numbered 56 through 66. As heretofore noted, the defendant Nafie was in teller cage No. 62. Photographs of the area indicate that the construction of the tellers' cages is such that only the tellers in the very nearest cages to him could see him. Mrs. Marie J. Carr was a customer of the Bank. Ennis had formerly served in her neighborhood as a police officer and she was acquainted with him. On December 2, 1960, at around 11:30 o'clock A.M., Mrs. Carr came into the Bank to make a deposit. There was no customer at the defendant Nafie's window, so she went to that window and made a deposit. After making the deposit, Mrs. Carr walked up the lobby towards Ennis and had a short visit. While he was visiting with her he kept facing south. The alleged robbery purportedly took place shortly after 11:30 o'clock A.M. Neither Mrs. Carr nor Ennis observed any colored men in the area in front of the defendant Nafie's window at the time of the alleged robbery. The defendant Nafie testified that following the delivery of the currency one of the colored men walked to the north and the other one walked to the south. At that time a person walking to the north would walk within about five feet of Ennis. He saw no colored men go past him. Helen Kirk, who was on duty in teller cage No. 58 at around the time in question, saw no colored men in the area and did not hear any unusual noise. Harriet Conyers, who was on duty in teller cage No. 64 at the time in question,

saw no colored man or men in the area prior to the time the defendant Nafie called to her. There inheres in the verdicts of the jury the findings that the alleged robbery never occurred and that under the guise of a simulated robbery $15,226 was purloined from the Bank by the defendant Nafie.

It was not the practice of the Bank to keep a record of the serial numbers of the currency handled by it, not even of the new currency. The defendant Nafie testified she was familiar with that practice. Lester Phillips, the head currency teller of the Bank, testified that on or about December 20, 1960, he had a conversation with the defendant Nafie. He further testified that in that conversation she told him "they" had been giving her a rough time and that "they" claimed that they could identify some of the missing new bills by serial numbers and that she told them they would be unable to do so. While she did not specifically identify who she meant by "they," it could be inferred she was referring to the agents for the Federal Bureau of Investigation. Thus, it appears that the defendant Nafie felt quite certain that none of the missing currency could be traced by means of serial numbers. However, further investigation by the Bank following the alleged robbery disclosed that it was possible to determine the serial numbers of certain of the new currency receipted for by the defendant Nafie on the forenoon preceding the alleged robbery which was not in the cage following that alleged robbery. In the forenoon preceding the alleged robbery the defendant Nafie had receipted for and received $8,000 in currency. Included in that currency was a packet of new fifty-dollar bills and a packet of new twenty-dollar bills. The bills in both packets were numbered consecutively. By checking the serial numbers of the new fifty-dollar bills and the new twenty-dollar bills still in the defendant Nafie's cage following the alleged robbery, the Bank officials were able to determine the serial numbers of new fifty-dollar bills and new twenty-dollar bills which had

been receipted for by the defendant Nafie prior to the alleged robbery and which were not in the cage after the alleged robbery. The defendant Rizzo and his brother Angelo conducted their banking business at the Manchester Bank. The agents of the Federal Bureau of Investigation furnished to officials of the Manchester Bank the serial numbers of the missing new fifty and new twenty-dollar bills and asked them to check the currency deposits of the defendant Rizzo and his brother for those bills. For some time prior to October, 1960, there had been a Fire Place Restaurant account with the Manchester Bank. That account was closed around the end of October, 1960. On December 12, 1960, two accounts were opened in that Bank. One account was opened in the name of the defendant Rizzo and the other in the name of his brother, Angelo. The evidence showed that the account of Angelo was used as the account for the Fire Place Restaurant.

On December 12, 1960, Angelo Rizzo deposited with the Manchester Bank twelve of the new twenty-dollar bills taken in the alleged robbery. Four of these were deposited to his account which was used as the Fire Place Restaurant account; three were deposited in the account of the defendant Rizzo and five were used in a change transaction. On December 14, 1960, Mrs. Beulah Jones, the office girl for the Fire Place Restaurant, deposited one of the new twenty-dollar bills taken in the alleged robbery to the account of the defendant Rizzo. On December 19, 1960, Angelo Rizzo deposited one of the new fifty-dollar bills taken in the alleged robbery to the account of the defendant Rizzo and on the same day Angelo Rizzo used two of the new fifty-dollar bills taken in the alleged robbery in making payment on a joint Bank loan that had been made to him and the defendant Rizzo. On December 20, 1960, Mrs. Jones deposited one of the new fifty-dollar bills taken in the alleged robbery to the account of Angelo Rizzo.

The defendant Nafie assigns as error the overruling of her motion for judgment of acquittal made at the close of the Government's case in chief and renewed at the close of all the evidence. She contends that there was not sufficient competent evidence to sustain the finding of the jury that she was guilty of conspiring with the defendant Rizzo to purloin money from the Bank. The defendant Rizzo assigns as error the overruling of his motion for judgment of acquittal. He contends that the evidence was insufficient to sustain his conviction.

A conspiracy may and usually has to be established by circumstantial evidence. Isaacs v. United States (8th Cir. 1962), 301 F.2d 706, 724. A common purpose and plan may be inferred from the development and a collocation of circumstances. Glasser v. United States (1942), 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. In the case of Goode v. United States (8 Cir. 1932), 58 F.2d 105, this Court stated (p. 107):

> "A conspiracy is rarely susceptible of proof by direct evidence, but must be proved by circumstantial evidence. It may be deduced from the conduct of the parties and the attending circumstances."

In the case of Cooper v. United States (8 Cir. 1925), 9 F.2d 216, concerning the offense of conspiracy, this Court stated (p. 224):

> "It is practically always established by circumstantial evidence, and this method in no sense amounts to the building of one presumption upon another."

In Smith v. United States (8 Cir. 1907), 157 F. 721, this Court stated (p. 728):

> "The effects and results of a conspiracy can be observed and proved, but rarely can one get a glimpse or make proof of the secret conferences which inaugurate it. For these manifest reasons proof of a criminal combination to do an unlawful act can rarely be made except by light reflected from its consequences or results."

It is clear that in passing upon the question of the existence of a conspiracy the jury may consider the acts of the alleged conspirators, their individual or collective interest, their relations preceding and attending the culmination of the claimed conspiracy. In the case of Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co. (8 Cir. 1933), 64 F.2d 834, this Court stated (p. 837):

> "The inferences to be gathered from a chain of circumstances depend largely upon the common sense knowledge of the motives and intentions of men in like circumstances."

The record in the present case was such that the jury could find that the circumstances hereafter referred to had been established by the evidence. The defendant Rizzo solicited Betsher and McGill to participate in a simulated robbery of the Bank. Their part was to remove with all possible dispatch from the area of the Bank money which would be purloined from the Bank by an employee thereof by means of a simulated robbery. The defendant Rizzo outlined in detail the exact manner and way in which the simulated robbery would be staged. Later a person employed by the Bank by means of simulated robbery, staged in the exact manner and way detailed by the defendant Rizzo, did purloin money from the Bank. The defendant Rizzo shared in the fruits of the simulated robbery.[2] In addition, prior to the defendant Rizzo soliciting Betsher and McGill to participate in the simulated robbery of the Bank, in a conversation between the defendant Rizzo and the defendant Nafie relating to the subject of securing money, the defendant Nafie suggested a robbery of *the bank*. (Emphasis supplied.)

In the case of Cramer v. United States (1945), 325 U.S. 1, p. 33, 65 S.Ct. 918, p. 934, 89 L.Ed. 1441, the Court stated:

> "What a man is up to may be clear from considering his bare acts

---

2. United States v. Johnson (2d Cir. 1958), 254 F.2d 175, 176.

by themselves; often it is made clear when we know the reciprocity and sequence of his acts with those of others, the interchange between him and another, * * *."

In the present case the evidence was such that the jury could properly find from the "bare" facts stated that what the defendants Nafie and Rizzo were up to was to purloin money from the Bank by means of a simulated robbery.

In connection with her contention as to the claimed insufficiency of the evidence as to her, the defendant Nafie contends that the evidence aliunde of the declarations made by the defendant Rizzo in her absence was insufficient to connect her with the conspiracy. Connected with that contention is the contention that her objections to the testimony of Betsher and McGill as to the declarations made by the defendant Rizzo in her absence as to her being a party to the conspiracy were improperly overruled. It is well settled that a person cannot be connected with a conspiracy solely by declarations made by an alleged co-conspirator in his or her absence. Harlow v. United States (5th Cir. 1962), 301 F.2d 361, 368. It is also well settled that in order that the declarations of an alleged co-conspirator be admissible against a defendant there must be proof aliunde of the alleged declarations of the existence of a conspiracy and the declarations must have been made pursuant to and in furtherance of the conspiracy. In the present case the testimony of Betsher and McGill as to the attempts to have them participate in a simulated bank robbery and their testimony as to the declarations made by the defendant Rizzo as to the connection of the defendant Nafie with the proposed simulated bank robbery was presented early in the trial. It is the contention of the defendant Nafie that at the time Betsher and McGill testified as to those declarations there was not sufficient evidence aliunde of the declarations of the defendant Rizzo indicating the existence of the conspiracy and that, therefore, her objections to the then testimony as to

such declarations was improperly overruled in the then state of the record. It is discretionary with the trial court to admit evidence of declarations of alleged conspirators subject to later proof as to the existence of the conspiracy. Reistroffer v. United States (8th Cir. 1958), 258 F.2d 379, 386, 387, certiorari denied (1959), 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed. 301; Donaldson v. United States (9th Cir. 1957), 248 F.2d 364, 366; Wigmore on Evidence (3d Ed. 1940), Vol. IV, Sec. 1079, p. 131. See also Tingle v. United States (8th Cir. 1930), 38 F.2d 573, where this Court stated (p. 575):

"Mere irregularity in the order of proof is generally permissible within the sound discretion of the court, and will not constitute reversible error provided the record ultimately contains evidence which renders competent and material that which has thus been admitted out of order."

It is the duty of the trial court to pass upon the question as to whether a sufficient prima facie showing had been made as to the existence of a conspiracy aliunde of the declarations of an alleged co-conspirator to admit into evidence or to leave in evidence the declarations of such co-conspirator. In the present case there inhered in the rulings of the trial court the holding that a sufficient prima facie showing had been made as to the existence of a conspiracy aliunde of the challenged declarations to warrant consideration of such declarations by the jury. In the present case the trial court went further. It instructed the jury as follows:

"You must first determine from all the evidence in the case relating to the period of time defined in the indictment whether or not a conspiracy existed. In considering whether or not a defendant was a member of the conspiracy, you must do so without regard to, and independently of, the statements and declarations of the other or others. In other words, you must

determine the membership of each defendant from the evidence concerning his or her own actions, conduct, deliberations, or statements and his or her own connection with the action and conduct of others. However, once you have determined that a defendant was a member of the conspiracy, using this test, you may then consider as if made by him or her the statements, declarations and acts of other co-conspirators made in furtherance of the conspiracy during the existence thereof."

No exception was taken to that instruction.[3]

In the present case at the end of the Government's case the evidence presented by it, apart from the evidence as to declarations made by one defendant in the absence of the other, showed such a collocation of circumstances and striking parallelism of acts and conduct as to constitute a prima facie showing of the existence of a conspiracy between the two. Such collocation of circumstances and striking parallelism of acts and conduct prima facie identified the defendant Nafie as being connected with the conspiracy apart from the declarations of the defendant Rizzo that she was so connected.

The contention of the defendant Nafie that there was insufficient evidence aliunde of the declarations as to her being connected with the conspiracy made by the defendant Rizzo in her absence is not well founded.

In the case of American Tobacco Company v. United States (1946), 328 U.S. 781, p. 810, 66 S.Ct. 1125, p. 1139, 90 L. Ed. 1575, the Court stated:

"Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified."

In the present case the circumstances were such as to justify the jury in finding that a conspiracy to purloin money from the Bank had been established.

The motions of the defendants for judgments of acquittal based upon the insufficiency of the evidence were properly overruled by the trial court.

The defendant Rizzo assigns as error the overruling of his objection to certain testimony of Lester Phillips. He was the head currency teller of the Bank. He testified, as heretofore noted, that about two weeks after the simulated robbery the defendant Nafie in a conversation with him stated that it would not be possible to identify any of the missing currency by serial numbers. The defendant Rizzo objected to that testimony and also asked the trial court to declare a mistrial because of its reception. The objection and motion were overruled. Upon overruling the objection the trial court instructed the jury, in substance, that there were two defendants and that they should keep in mind with whom conversation in question was had. If it be considered that the instruction of the trial court did not adequately limit the jury's consideration of the testimony to the charge against the defendant Nafie, no error appears for it seems clear that the testimony as to the conversation was admissible as against both defendants. The realization of the fruits of a conspiracy is an integral part of a conspiracy. In the present case the fruits of the conspiracy commenced to be realized by the defendant Rizzo starting with ten days after the simulated robbery. This early realization of the fruits of the conspiracy would tend to indicate that the conspirators were of the belief that the purloined currency could not be traced by serial numbers and that it could be safely used without fear of detection. The testimony of Lester Phillips as to the conversation in question with the defendant Nafie tended to throw light on and

---

3. In this connection see Reistroffer v. United States, supra, where the situation was similar.

explain the using of the purloined money so soon after the simulated robbery. The trial court properly overruled the objection of the defendant Rizzo to the testimony in question.

█ Both of the defendants assign error in connection with what are referred to as the Franklin Life Insurance Company checks. It was heretofore noted that the witness Charles A. Betsher had in March, 1961, plead guilty to defrauding the Franklin Life Insurance Company by means of forged endorsements of checks issued by the Franklin Life Insurance Company and that the defendant Rizzo had been convicted of the same offense and that his appeal from that conviction was pending at the time of the trial in the present case. After the jury had been impanelled in the present case but before any evidence was presented, the attorneys for the defendants in the absence of the jury brought up the question as to whether the Government intended to introduce into evidence in the present case any of the Franklin Life Insurance Company checks involved in the criminal case against Betsher and Rizzo. The attorneys for the defendants stated the introduction of those checks into evidence in the trial then about to start would be highly prejudicial. The attorney for the Government stated that it did not intend to introduce any of the Franklin Life Insurance Company checks into evidence. It did not introduce any of those checks into evidence. It was heretofore noted that Charles Moore testified that in May, 1960, he was present at conversation had between the defendant Rizzo and the defendant Nafie and that during that conversation the defendant Rizzo inquired of the defendant Nafie as to whether "she would cash another one of those Franklin checks" and that the defendant Nafie replied, "it would be easier to rob the bank." Both defendants objected to that testimony and asked that a mistrial be declared. The testimony that the defendant Nafie stated that "it would be easier to rob the bank" was admissible as bearing on the intent of the defendant Nafie and as indicating her state of mind. The testimony was admissible as to both defendants. It was proper for the Government to trace the growth of the conspiracy from its probable beginning. The testimony tended to throw light upon subsequent acts of the defendants. The following is a frequently quoted statement: [4]

"You might as well expect that one should be able to judge correctly the merits of a play, and of the motives and conduct of the actors as displayed therein by witnessing only the last scene of the last act as to expect, where the crime under investigation is part of a connected scheme, that the jury should be able to determine the motives of the defendant and judge correctly of his guilt or innocence without any knowledge of the origin of the crime, or of the circumstances and motives that led up to it. The law does not blindfold courts and juries in that way, and it is always competent to show the beginning as well as the end of the criminal transaction."

█ The defendants also objected to the testimony as to the conversation between the two defendants because mention was made in the conversation of the Franklin Life Insurance Company checks. They moved for a mistrial. Their objections and motions were overruled. Later Charles A. Betsher testified that when he was solicited by the defendant Rizzo to participate in purloining money from the Bank the latter referred to the defendant Nafie as the bank teller "who had cashed checks for us." The defendant Rizzo objected to that testimony on the ground it brought into the case the matter of his conviction on the Franklin Life Insurance Company checks charge. The objection

4. Butt v. State, 81 Ark. 173, 181, 182, 98 S.W. 723, 726.

was overruled. In connection with the ruling the trial court stated:

"I don't know that the witness has said anything up to this point other than it was the girl that cashed the checks for us."

The references to the Franklin Life Insurance Company checks were incidental. Under the state of the record the references were unenlightening to the jury on the matter of the commission of another crime. The assignments of error related to the rulings of the trial court in connection with the reference to the Franklin Life Insurance Company checks are not well founded. In connection with those rulings certain other rules might be noted. In the case of Devoe v. United States (8th Cir. 1939), 103 F.2d 584, at p. 588, certiorari denied (1939), 308 U.S. 571, 60 S.Ct. 84, 84 L.Ed. 479, the Court stated:

"It is elementary that in the trial of a case, whether civil or criminal, relevant and competent evidence is admissible even though it tends to prove the commission of criminal acts, not in issue, by the party against whom the evidence is offered. Where evidence of transactions between those charged to have been associated in the commission of a criminal act throws light upon the particular transaction for which they were indicted, it is admissible, regardless of the fact that it tends to implicate the defendants in the commission of other offenses."

In the case of Bracey v. United States (1944), 79 U.S.App.D.C. 23, 142 F.2d 85, p. 88, certiorari denied (1944), 322 U.S. 762, 68 S.Ct. 1274, 88 L.Ed. 1589, the Court stated:

"Thus, evidence of other criminal acts has been held admissible by this court when they are so blended or connected with the one on trial as that proof of one incidentally involves the other; * * *."

The defendant Nafie assigns error because the trial court sustained an objection of the Government in connection with jury argument of her attorney. The defendant Nafie testified that she had never cashed any checks for the defendant Rizzo and had never discussed the matter of cashing checks for him. In his jury argument the attorney for the defendant Nafie stated as follows: "Miss Nafie testified she never cashed a check for Mr. Rizzo and you can rest assured that if she had the proof would have been in here and it wasn't here." The objection of the Government to that statement was sustained and the jury instructed to disregard it. The defendant Nafie assigns error based on the sustaining of the Government's objection. It was heretofore noted that prior to the presentation of evidence the defendant Rizzo, in substance, insisted that the introduction into evidence of Franklin Life Insurance Company checks would constitute prejudicial misconduct on the part of the Government and that in response thereto the attorney for the Government stated that it was not the intention of the Government to introduce any of those checks into evidence. In a hearing on the objection of the Government conducted in the absence of the jury, the trial court stated, in substance, that the attorney for the defendant Nafie had insisted that the checks in question be kept out of evidence and then sought in jury argument to raise the question as to why the Government did not put them into evidence. The trial court properly sustained the Government's objection to the argument in question.

It was heretofore noted that Albert Ennis, a bank guard, testified that at the time of the alleged robbery he was in a position to observe the area immediately in front of the defendant Nafie's teller cage and that he saw no colored man or men in that area. Upon the conclusion of his direct examination, the Government furnished the defendants with the statement made by the witness to the Federal Bureau of Investigation. He was first cross examined by the attorney for the defendant Nafie. During such cross examination he testified that following the alleged robbery he told the

head agent for the Federal Bureau of Investigation what he knew about the matter. He was then asked whether he had told that agent that immediately prior to the alleged robbery he was talking to Mrs. Carr. The trial court, in the absence of the jury, stated as follows:

"I can't let you go on. We are not concerned with what this man told the agent. We are concerned with what he saw there that day. The only purpose of such a report is if you want to lay the foundation if there is any statement he made which is contradictory, then you can show that. We are not at all interested in what he told the agent. However, if you have something there that is contradictory to what he says here then lay the foundation and bring it out and prove it and let's proceed in that way."

The defendant Nafie assigns error on the part of the trial court in that connection. It is the contention of that defendant that the trial court unduly restricted his cross examination of the witness. It appears that the trial court was of the view that the cross examination was not being conducted in a proper manner and suggested a manner in which it could be properly conducted. The action of the trial court acting in a supervisory capacity was proper.

It is difficult to see just how the defendant Nafie could possibly have been prejudiced in any way by the action of the trial court. Ennis had testified on direct examination that at about the time of the alleged robbery he was visiting with Mrs. Carr. He also so testified on cross examination. The attorney for the defendant Nafie in his argument to the jury argued, in substance, that the fact that Ennis was visiting with Mrs. Carr was favorable to the defendant Nafie in that it cast doubt on the accuracy of his observations as to what might be occurring in the vicinity of the defendant Nafie's teller cage. If Ennis had testified that he was not visiting with Mrs. Carr at the time, then questions tending to bring out that he was in

fact visiting with Mrs. Carr at the time would have been proper and fitting. It does not appear just how it might benefit the defendant Nafie to go into the question of whether he had made statements to third parties which were in accord with that portion of his testimony which was favorable to her.

■■ The defendant Nafie assigns error because of the giving of an instruction referred to as instruction No. 12. That instruction was as follows:

"If you find that the defendant Ruby Nafie made statements to investigating officers regarding the matters under inquiry and pertinent thereto which were contrary to the proven facts and did so willingly and with knowledge of the falsity, you are at liberty to consider that circumstance as evidence of said defendant's guilty conscience regarding the matter under inquiry. Now what is pertinent and whether same was contrary to proven facts or done willingly and with knowledge, or whether you consider same or not, is for you as triers of the facts to determine from all the evidence before you."

The defendant Nafie excepted to the giving of that instruction. It has long been settled that the fact that a defendant has made false statements in explanation of the conduct which is the subject of a criminal charge against him is admissible as tending to indicate his guilt. Wilson v. United States (1896), 162 U.S. 613, 620, 621, 16 S.Ct. 895, 40 L.Ed. 1090; Costello v. United States (8th Cir., 1958), 255 F.2d 389, 397, certiorari denied (1958), 358 U.S. 830, 79 S.Ct. 51, 3 L.Ed.2d 69. See also Andrews v. United States (5th Cir. 1946), 157 F.2d 723, 724. The instruction given by the trial court in this case was the same, in substance, as an instruction approved by this Court in the case of Costello v. United States, supra. The instruction excepted to was a proper instruction.

■ The defendant Rizzo assigns error based upon a ruling of the trial court

in connection with the cross examination of the witness Charles A. Betsher. The attorney for the defendant Rizzo during the cross examination of that witness asked him certain questions about his relations with a Jenner and a Noble. Upon objection being made by the Government to those questions, the attorney for the defendant Rizzo, in the absence of the jury, stated that he proposed to ask the witness whether he had arranged with Jenner and Noble to simulate a burglary of his home for the purpose of collecting burglar insurance and to kill his wife so that he might collect on her life insurance. The trial court sustained the objection of the Government to the proposed line of cross examination. The proposed questions were of an accusatory nature and were unsupported by any offer of proof of conviction of either of the alleged offenses proposed to be inquired about.

■ It is the long and well-settled Federal rule that it is not permissible to show that a witness has been arrested or accused of or charged with a criminal offense or to inquire as to such fact upon cross examination for the purpose of impairing his credibility where no conviction is shown. Glover v. United States (8th Cir. 1906), 147 F. 426. See Echert v. United States (8th Cir. 1951), 188 F.2d 336, 337, and Lawrence v. United States (8th Cir. 1927), 18 F.2d 407. See also cases cited in 20 A.L.R.2d 1425. In the case of Michelson v. United States (1948), 335 U.S. 469, p. 482, 69 S.Ct. 213, p. 221, 93 L.Ed. 168, the Court stated: "Only a conviction * * * may be inquired about to undermine the trustworthiness of a witness." The assignment of error of the defendant Rizzo based upon the ruling of the trial court in question is clearly lacking in merit.

The defendants assign error based upon the instructions given by the trial court in response to a question by the jury. This Court has reviewed the record in connection with that assignment of error and finds that it is not well founded.

The case was tried by the late Judge Randolph H. Weber. The record manifests his fairness and impartiality. The record manifests tact, patience and wisdom on his part. He handled the trial in a most able and competent manner.

The defendants had a fair and impartial trial which was free from error.

The judgments of conviction appealed from are affirmed.